## UNITED STATES v. CLEVELAND and five other cases.

Criminal Nos. 14475–14477, 14478, 14480, 14481, 14483, 14489.

District Court, D. Utah, Central Division. May 22, 1944.

Dan B. Shields, U. S. Atty., and John S. Boyden, Asst. U. S. Atty., both of Salt Lake City, Utah, for plaintiff.

J. H. McKnight, Claud T. Barnes, and Knox Patterson, all of Salt Lake City, Utah, for defendants.

KENNEDY, District Judge.

The above entitled causes involve indictments against the defendants in the form of eight separate and distinct charges some of which indictments include more than one count. Eight of these indictments are brought under the Mann Act, or "White Slave Traffic Act", 18 U.S.C.A. § 398, and one under the so-called "Lindbergh Act", 18 U.S.C.A. § 408a.

After the presiding Judge of the District had retired in consequence of an affidavit of prejudice in one case and likewise voluntarily withdrew in the other cases, the writer of this memorandum was assigned to the Utah District for the purpose of disposing of said cases.

Motions were interposed by defendants to quash the indictments upon the ground that they were not properly brought under the Acts mentioned, and on account of irregularities occurring in connection with the grand jury which returned the indictments. These motions to quash were all argued orally and overruled, the first motion upon the ground that the indictments had every appearance of regularity upon the face to be within the scope of the Act under which they were brought, and the second upon the ground that there was no evidence or proof before the Court that there was any bias or prejudice or irregularities in the action of the grand jury upon which the Court could presume to act in the premises, other than an allegation that the foreman of said jury was a member of a different sect of which the defendants were alleged to be adherent, which was considered insufficient to sustain the motion in the absence of any affirmative showing that the foreman of the grand jury personally entertained views antagonistic to the defendants or, even if he did, that there was no showing as to any bias or prejudice on the part of any of the other members of the grand jury returning said indictments. The Court will now adhere to the original rulings upon said motions.

After considerable discussion in open Court as to the manner in which said cases would be disposed of, a trial jury being then and there in attendance, it was agreed that the several cases would be submitted to the Court without the intervention of a jury upon a stipulation of facts, and the Trial Judge thereupon reluctantly, if for no other reason than to protect the Court and the community from unsavory details of evidence and unpleasant notoriety, accepted the responsibility with the understanding that the defendants would be severally arraigned, enter their pleas of not guilty, waive trial by jury and agree personally to abide by the stipulation of their counsel as to the facts in each case, which procedure was thereafter carried into effect. On behalf of each and every defendant a motion for his discharge and entry of judgment of not guilty was interposed and the Court provided by order that trial briefs should be filed by counsel after the receipt of which the decision in the sev-

eral cases would be taken under advisement. Such trial briefs have been submitted and are now before the Court for consideration.

It would be impractical in this memorandum to set out in detail the charges in the indictments or the stipulated facts upon which the government relies in support of the charges therein contained, but a brief rehearsal in each of the cases would seem to be necessary as a foundation for a decision of the Court, omitting some of the more sordid details.

In the Cleveland case, No. 14475, it is charged that the defendant transported Kathryn Lucy Collinwood from the State of Utah to the State of Wyoming for the purpose of debauchery and for the purpose of sexual intercourse, said woman not then being the wife of the said defendant but for the purpose that she should be and act as his mistress and concubine. In No. 14476 it is charged that he transported Marcia Covington from the State of Utah to the State of California for the same purposes as set forth in the previous indictment; and in No. 14477, in the first count, it is charged that he transported one Marie Beth Barlow from the State of Utah to the State of Colorado for the purposes aforesaid; in the second count it is charged that the defendant transported the same woman for the purposes aforesaid from the State of Utah to the State of Colorado, and in the third count that he transported Kathryn Lucy Collinwood from the State of Utah to the State of Wyoming for the same purposes. In the stipulated facts, which were accepted by the agreement as the proofs in the case, it appears that the women were transported by the defendant as charged in the indictments and that sexual relations were indulged between the defendant and each of said women and that he lived with each of said women in the relationship of husband and wife. It is stipulated that the defendant committed said acts as a believer in the practice of polygamy in having more than one wife at the same time and that in so acting he was practicing the original doctrines of his church.

In the Darger case, No. 14478, the defendant is charged with unlawfully transporting, for the immoral purpose of having one Jean Barlow to live with him as his mistress and concubine, from the State of Colorado to the State of Utah. In the stipulation of facts it is shown that the defendant was married in 1926 to Aldora McDaniel, from whom he secured a divorce in Nevada in April 1943, but that in 1942 the defendant had two plural wives in addition to his lawful wife and that one of these, to-wit: Jean Barlow, he transported by automobile from the State of Colorado to the State of Utah where he lived with the said Jean Barlow and his other wives in a state of plural marriage, all of which acts were in accordance with a religious belief of defendant.

In the Jessop case, No. 14480, the indictment charges that the defendant transported one Mae Johnson from the State of Utah to the State of Arizona for the purpose of debauchery and for the further immoral purpose that the said woman should become his mistress and concubine. In the agreed statement as the government testimony, it appears that the defendant was married in 1926 to one Verna Spencer and was and is still the lawful husband of said Verna Spencer, having had nine children as the issue of said marriage. That thereafter one Mae Johnson came to live at the home of the defendant and he secured her agreement to enter into a marriage in accordance with the Fundamentalists' belief in the doctrines and teachings of the Mormon Church and that he lived with her, the said Mae Johnson, as man and wife, at the same time he was living with and supporting his legal wife, and that in July 1943, he transported the said Mae Johnson from the State of Utah to the State of Arizona and there lived with her as man and wife.

In the Chatwin, Zitting and Christensen case, No. 14481, it is charged that the defendants inveigled and decoyed one Dorothy Wyler, a minor child of the age of fifteen years, and caused her to be transported from the State of Utah to the State of Arizona. In the stipulation of facts it appears that the government would have offered proof that the defendant, Chatwin, approached the parents of the girl, Dorothy Wyler, with regard to her becoming a housekeeper; that said girl was then about fourteen years of age, backward in school, and had a mental age of about seven years and two months; that while so working in the home of the defendant Chatwin she was taught the doctrine of plural marriage to which she became converted, and entered into a plural marriage with the defendant Chatwin and that thereafter the defendants convinced the said Wyler that she should go to Mexico to be married legally to the said Chatwin and, in pursuance to such design, she was transported and caused to be transported by the defendants from the State of

Utah to Juarez, Mexico, where she and the defendant went through a purported marriage ceremony and thereafter she was transported to Short Creek, Arizona, all of which transportation was without the consent and against the wishes of the parents of the said Dorothy Wyler and while she was under the authority of the Juvenile Court of Utah County, Utah, which said acts were performed in accordance with a religious belief in plural marriages.

In the Dockstader and Stubbs case, No. 14483, it is charged that the defendants did transport and cause to be transported one Anna Lindgreen from the State of Utah to the State of Arizona for the purpose of debauchery and the further immoral purpose that the said woman should cohabit with the defendant Dockstader as his mistress and concubine. In the stipulation it appears that the said defendant Dockstader was living in a plural marriage condition with one Anna Lindgreen while at the same time and prior thereto he was married to Leah Kilpack Dockstader in Salt Lake County, Utah; that in July 1943, the defendant Dockstader made arrangements with the defendant Stubbs to transport Anna Lindgreen and some furniture to Short Creek, Arizona where the said Anna Lindgreen was to live in plural marriage with the defendant Dockstader and his legal wife, Leah Kilpack Dockstader; that at the time of said transportation both of said defendants were members of a religious cult known as Fundamentalists and professed belief in the plural marriage under the original concepts of the Mormon Church.

In the Petty case, No. 14489, the defendant is charged with unlawfully transporting, by automobile, one Mary Marguerite Ford, from the State of Idaho to the State of Utah for the immoral purpose of having her to live with him as his mistress and concubine and, in the agreed facts, the government proof would be that the defendant was married to one Iva Campbell in December, 1913, and since said time has continued to be her lawfully wedded husband; that subsequently, in Idaho, he became acquainted with one Mary Marguerite Ford and that thereafter he secured the consent of said Ford to enter into a marriage according to the concepts of his religious belief and that thereafter he transported the said Ford to the State of Utah and continued to live with her as man and wife while still living with his legal wife.

In the foregoing, as above stated, no attempt has been made to set out in detail all the allegations of the indictments or stipulated facts to be presented by the government in the event the cases had been tried, and to which the defendants assented by their stipulation, but sufficient has been shown to outline the record before the Court for the purpose of a discussion of the legal principles involved.

■ I think it is clear from what has been stated that, absent the element of a religious belief in plural marriage asserted by the defendants, the evidence would be sufficient to justify the conviction and judgment of guilt as to each. It is asserted in behalf of defendants that the crimes charged do not amount to prostitution or debauchery as set forth in the Statute. The White Slave Traffic Act was passed by Congress in 1910 and, in 1916, it finally came before the United States Supreme Court for construction, in Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168. There, in several cases consolidated for hearing, it was strenuously asserted that the Act was never intended to cover cases other than those in which commercialized vice was involved but eventually, in spite of the opposition of an earnest minority of the High Court asserted in a dissenting opinion, the Court decided that, under the terms of the Act, the element of gain was not to be interpreted as a necessary element of the crime specified by the Statute and it was held that the transportation for an immoral purpose to-wit: that a woman should become a mistress and concubine, was within the terms of the Statute. In all the cases before the Court at the present time where the indictments are brought under this Act this relationship is specifically charged. From that day to this it has been earnestly argued that the Act does not apply to a variety of circumstances in which the purpose of commercial gain does not appear and yet the Supreme Court has never modified nor reversed its decision in this respect, nor since the first decision has the Congress proposed to vary or change the terms of the Act which in a sense means that it puts the stamp of approval by the Congress upon the construction given by the Court. It cannot be successfully asserted that if the Congress had intended to cover polygamy in furtherance of a religious belief, it would have so spoken, but on the contrary the more logical reasoning would be that if Congress in-

tended to exempt acts committed in furtherance of religious beliefs, it would have so stated.

■ Likewise, as to the Kidnapping or Lindbergh Act it has been held by the Supreme Court in Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522, that under the terms "ransom" or "reward" or "otherwise", the Act is not confined to cases in which ransom or reward is specifically involved but that under the term "otherwise" may be included any benefits which may accrue to the violator of the law.

So much for the construction of the indictments and what the Court conceives to be an outline of the evidence in their support under the stipulations. From this analysis the conclusion must be that unless the acts of the defendants, performed in the furtherance of a religious belief, are exempted from the operation of the Statutes, they must be held amenable to their provisions.

We turn therefore to a consideration of this element as a justification and defense of the several acts on the part of the defendants.

In addition to the copious briefs which have been offered are pamphlets, magazine articles, pictures and also complete volumes in book form, which purport to sustain the religious beliefs of the defendants and practice of polygamy in furtherance of such beliefs, for consideration by the Court. These have all been given attention, although they can scarcely be said to aid the Court in the disposition of the matters at hand. The theories in regard to the teachings of the Bible, the Book of Mormon, the Doctrines and Covenants as presented have been at least highly educational to the Court and have been accepted in the spirit in which I believe them to have been tendered. However, I cannot believe that counsel have advanced them for the purpose of having the Court make a judicial declaration that the doctrine of plural marriage constitutes a "pure religion", but that they are to be considered more from the standpoint of what defendants conceive to be an interference with their religious beliefs as accorded by the Constitution. The Courts have frequently paid their respects to the practice of polygamy and in each instance, so far as I have been able to discover, it has been condemned. No instance has been cited where either the Congress or the Supreme Court have favorably spoken in regard to it. The assertion is made that on these various occasions the observation of the Court in its opinion can be considered as dicta and this Court is willing to so attribute these statements so far as it may be permissible for the purposes of the discussion, in accordance with the contention of counsel, but there are certain statements in these opinions which must be regarded as fundamental and underlying the treatment of belief in polygamy as well as all religious beliefs in any case where it is pertinent. Some of the cases to which reference has been made are: Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244; Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637; Late Corporation of The Church, etc., v. United States, 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 478; and United States v. Bitty, 208 U.S. 393, 28 S.Ct. 396, 52 L.Ed. 543.

■ The real basis of counsel's contention here that the defendants are being illegally and unjustly prosecuted is that their rights under the First Amendment to the United States Constitution have been violated. This Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof", and it is undoubtedly operative as to the States under the provisions of the Fourteenth Amendment. I have no quarrel with the proposition that every person should be entitled to entertain his own individual religious beliefs but I have entertained the theory, and so expressed it in other cases involving the matter of religious beliefs, that when such beliefs lead to practices which contravene and violate the law of the land, then such beliefs must yield and be subordinated to such law for otherwise government by law would amount to chaos. This view is supported by the language of the Supreme Court in Reynolds v. United States, supra, 98 U.S. at page 166, 25 L.Ed. 244:

"So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines or religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

And this doctrine so announced has never been repudiated or changed so far as I can discover in later pronouncements of the Supreme Court but, on the other hand, it has reiterated the general principle repeatedly since that time. As late as 1943, in Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81, the Court cites the Reynolds and Beason cases in connection with the following observation at page 109 of 319 U.S., at page 873 of 63 S.Ct.

"Moreover, we do not intimate or suggest in respecting their sincerity that any conduct can be made a religious rite and by the zeal of the practitioners swept into the First Amendment."

In a Republic such as ours laws are adopted through the will of the majority by representatives of the people assembled in legislative forums. In all the States of the Union I believe, and in the States whose lines have been crossed as alleged in the indictments, there are laws enacted which prohibit polygamy or plural marriages. In this respect therefore we have no law which could be invoked here by which such marriages might be legally sustained. It follows that by logical analysis one who takes unto himself more than one wife at the same time violates such law, and any woman who purports to be other than the first and legal wife of a man falls within the classification of a mistress or concubine and if acts are practiced in connection therewith which apply to that class of individuals they fall within the scope of any Act in regard to which there is a prohibition.

It is earnestly argued that because the States have the exclusive right to make laws respecting polygamy and plural marriage that every case in which that question is involved must be prosecuted exclusively in the State Courts. The answer to that argument is that when certain acts are proven to have been performed which are violative of a Federal Statute they can be prosecuted in the Federal Courts and here the indictments charge, and proof is offered to support them, that the defendants entered into practices with women as mistresses and concubines by transporting them back and forth across State lines which bring the cases at bar within the scope and purpose of the Mann Act as interpreted by the Supreme Court. This Court is in sympathy with the suggestion, personally, that it would prefer to see the cases tried in the State Courts but is not impressed with the logic of the argument, no matter how much the Court might prefer to see that method pursued. The Court is not permitted to evade a judicial responsibility on the ground of caprice or individual desire no matter how strong the inclination may be. As in the case of removals from the State Court, the Court is empowered to remand a case and from his action in so doing there is no appeal; however this does not justify the Court to lightly pass over the matter of actually deciding judicially what the rights of the litigants may be in invoking the jurisdiction of the Federal Court. So here, if the acts committed by the defendants fall within the inhibitions prescribed by the Federal Law, the Court is bound to take cognizance of them whether founded upon religious belief or any other form of belief on the part of the offending parties. The Court here is concerned not with religious beliefs which may be maintained freely but with overt acts which are in violation of Statute. In quoting from a preamble to an early act concerning religious freedom, Mr. Chief Justice Waite recites with approval (Reynolds v. United States, supra, 98 U.S. at page 163, 25 L.Ed. 244) as follows:

"it is declared 'that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order.' In these two sentences is found the true distinction between what properly belongs to the church and what to the State."

Counsel raise the point that because the Mormons arrived in a country which was then under the jurisdiction of Mexico and which by subsequent treaty became a part of the United States and in the treaty the rights to religious beliefs were preserved, that they are not to be interfered with in the matter of polygamous practices. The answer to this argument is that subsequently the territory covered by the treaty was organized by Congress into a territory of the Nation and therefore became subject to the laws of Congress which should be enacted for its government. The Supreme Court in the cases cited, recognized the power of Congress to pass laws for such territorial government including the prohibition of polygamy and plural marriage. No rights along the line of religious beliefs, except those guaranteed by the Constitution, were reserved or preserved under

the treaty between Mexico and the United States.

The historical documents in the case at bar purport to show that polygamy was taught and practiced by the adherents of the Mormon faith for a period of at least fifty years before 1890. At that time the then President or Head of the Mormon Church issued a Manifesto to the effect that polygamy would be no longer taught or encouraged and its adherents were enjoined to refrain from marriages forbidden by the law of the land. The Mormon Church proper, spoken of in these cases as the "dominant" Mormon Church, still maintains the attitude as expressed by its Head in 1890. There was evidently a split in the Church (which is not unusual in all classes of Churches) and the adherents of the polygamistic doctrine, calling themselves "Fundamentalists" to which the defendants purport to belong, have appeared as not only earnest advocates of polygamy but have practiced it literally. This in a way forces the Court to the unenviable situation of sitting in judgment between factions in a Church fight. It is mentioned for the reason that defendants' counsel urge that there was no authority or power of Congress to include in its Act of Admission and in the Constitution tendered by the people of Utah incident to its desire to be admitted as a State, a provision that "polygamy or plural marriages are forever prohibited". Through the Act of Admission and the Constitution tendered and approved at the time, this provision became a covenant or contract between the United States and the State of Utah which legally and morally should be respected. The people of Utah, through their legal constitutional body of legislative representatives, have kept this faith by enacting a law which carries the provision into effect. The majority of the people of Utah territory acted in behalf of all the people in adopting its constitution and its laws respecting polygamy under it. The argument therefore that the people of Utah who may still believe in and practice polygamy are not controlled by the Act of Congress and the Constitution of Utah is ingenious but specious and not convincing.

Counsel have supplied the Court with the opinion of Judge Symes in United States v. Barlow, 56 F.Supp. 795, in which the Court sustained a motion to quash an indictment charging a conspiracy to violate the Act of Congress relating to the mailing of obscene, lewd or lascivious matter which was in fact literature purporting to support the religious belief in polygamy. I have no desire to interpose my views as a Judge in the manner in which this particular case has been disposed of, however I can readily see how that case may be differentiated from the cases at bar. In the first place, that part of the opinion which was adopted as a sample of what the literature so mailed really contained could scarcely be classified as obscene, lewd or lascivious but, in the second place, the literature being in furtherance of teaching a religious belief in polygamy might fairly be considered as being not only in consonance with the First Amendment guaranteeing the freedom of religion but also that other freedom in the same Amendment forbidding the "abridging the freedom of speech or of the press." In the cases under consideration here the indictments deal with overt acts actually carried on and practiced in connection with an asserted religious belief but nevertheless contrary to the law.

What has been said with relation to the White Slave Traffic Act applies equally in principle with the application to the Kidnapping Act. While the Courts of the country are always open to the appeal of its citizens to the protection of their rights in every respect, yet it must be apparent that the jurisdiction and authority of the Courts are limited to a narrow scope. It would seem more logical that the appeal for relief for those who now hold views concerning religious beliefs and practices thereunder should be made to the legislative branches of government for the adoption of laws consistent with their respective doctrines for after all, in a Republic which is at least supposed to be governed by the people themselves through representatives legally selected, the fundamental rights of the people are there vested and determined, which determination is final unless it can be said that the laws so enacted are in contravention of the Constitution, the supreme law of the land.

Apology is made for the rather inordinate length of this memorandum but the matter has seemed so important to counsel that I have felt justified in discussing it from as many angles as would seem pertinent to a conclusion upon the issues presented.

■ For the reasons stated, not only the motions to quash but also the motions for verdicts of not guilty and for discharge of

the defendants will be overruled and denied and defendants will each and severally be adjudged to be guilty of the charges laid in the indictments. A journal entry may be made by the Clerk to that effect and further entry of an order that the defendants may remain at liberty upon their respective bonds subject to such order as the Court may make for their appearance at a time when they should appear for final judgment. This time will be determined when the Trial Judge can find it possible to again sit for this purpose. In the event the defendants desire to carry their cases to the higher Courts, the matter of the appropriate procedure will then be considered.