## CLEVELAND v. UNITED STATES.

NO. 12.

Argued October 10, 1945. Reargued October 17, 1946.—Decided November 18, 1946.

*Claude T. Barnes* argued the cause for petitioners. With him on the brief were *Ed. D. Hatch* and *O. A. Tangren.*

*Assistant Solicitor General Judson* argued the cause for the United States on the original argument, and *Robert M. Hitchcock* on the reargument. With *Mr. Judson* on the brief were *W. Marvin Smith, Robert S. Erdahl* and *Beatrice Rosenberg.*

16

Mr. Justice Douglas delivered the opinion of the Court.

Petitioners are members of a Mormon sect, known as Fundamentalists. They not only believe in polygamy; unlike other Mormons,[1] they practice it. Each of petitioners, except Stubbs, has, in addition to his lawful wife, one or more plural wives. Each transported at least one plural wife across state lines,[2] either for the purpose of cohabiting with her, or for the purpose of aiding another member of the cult in such a project. They were convicted of violating the Mann Act (36 Stat. 825, 18 U. S. C. § 398) on a trial to the court, a jury having been waived. 56 F. Supp. 890. The judgments of conviction were affirmed on appeal. 146 F. 2d 730. The cases are here on petitions for certiorari which we granted in view of the asserted conflict between the decision below and *Mortensen* v. *United States,* 322 U. S. 369.

The Act makes an offense the transportation in interstate commerce of "any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose." The decision turns on the meaning of the latter phrase, "for any other immoral purpose."

*United States* v. *Bitty,* 208 U. S. 393, involved a prosecution under a federal statute making it a crime to import an alien woman "for the purpose of prostitution or for any other immoral purpose." The act was construed to cover a case where a man imported an alien woman so that she should live with him as his concubine. Two years later the Mann Act was passed. Because of the similarity of the language used in the two acts, the *Bitty* case became

---

[1] The Church of Jesus Christ of Latter-Day Saints has forbidden plural marriages since 1890. See *Toncray* v. *Budge,* 14 Ida. 621, 654–55, 95 P. 26.

[2] Petitioners' activities extended into Arizona, California, Colorado, Idaho, Utah and Wyoming.

a forceful precedent for the construction of the Mann Act. Thus one who transported a woman in interstate commerce so that she should become his mistress or concubine was held to have transported her for an "immoral purpose" within the meaning of the Mann Act. *Caminetti* v. *United States,* 242 U. S. 470.

It is argued that the *Caminetti* decision gave too wide a sweep to the Act; that the Act was designed to cover only the white slave business and related vices; that it was not designed to cover voluntary actions bereft of sex commercialism; and that in any event it should not be construed to embrace polygamy which is a form of marriage and, unlike prostitution or debauchery or the concubinage involved in the *Caminetti* case, has as its object parenthood and the creation and maintenance of family life. In support of that interpretation an exhaustive legislative history is submitted which, it is said, gives no indication that the Act was aimed at polygamous practices.

While *Mortensen* v. *United States, supra,* p. 377, rightly indicated that the Act was aimed "primarily" at the use of interstate commerce for the conduct of the white slave business, we find no indication that a profit motive is a *sine qua non* to its application. Prostitution, to be sure, normally suggests sexual relations for hire.[3] But debauchery has no such implied limitation. In common understanding the indulgence which that term suggests may be motivated solely by lust.[4] And so we start with words which

---

[3] "Of women: The offering of the body to indiscriminate lewdness for hire (esp. as a practice or institution); whoredom, harlotry." 8 Oxford English Dictionary 1497.

[4] "Vicious indulgence in sensual pleasures." 3 Oxford English Dictionary 79; "Excessive indulgence in sensual pleasures of any kind; gluttony; intemperance; sexual immorality; unlawful indulgence of lust." 3 Century Dict. Rev. Ed. 1477.

18

by their natural import embrace more than commercialized sex. What follows is "any other immoral purpose." Under the *ejusdem generis* rule of construction the general words are confined to the class and may not be used to enlarge it. But we could not give the words a faithful interpretation if we confined them more narrowly than the class of which they are a part.

That was the view taken by the Court in the *Bitty* and *Caminetti* cases. We do not stop to reexamine the *Caminetti* case to determine whether the Act was properly applied to the facts there presented. But we adhere to its holding, which has been in force for almost thirty years,[5] that the Act, while primarily aimed at the use of interstate commerce for the purposes of commercialized sex, is not restricted to that end.

We conclude, moreover, that polygamous practices are not excluded from the Act. They have long been outlawed in our society. As stated in *Reynolds* v. *United States,* 98 U. S. 145, 164:

> "Polygamy has always been odious among the northern and western nations of Europe, and, until the establishment of the Mormon Church, was almost exclusively a feature of the life of Asiatic and of African people. At common law, the second marriage was always void (2 Kent, Com. 79), and from the earliest history of England polygamy has been treated as an offence against society."

[5] *Blackstock* v. *United States,* 261 F. 150; *Carey* v. *United States,* 265 F. 515; *Elrod* v. *United States,* 266 F. 55; *Burgess* v. *United States,* 54 App. D. C. 71, 294 F. 1002; *Corbett* v. *United States,* 299 F. 27; *Hart* v. *United States,* 11 F. 2d 499; *Ghadiali* v. *United States,* 17 F. 2d 236; *United States* v. *Reginelli,* 133 F. 2d 595; *Poindexter* v. *United States,* 139 F. 2d 158; *Simon* v. *United States,* 145 F. 2d 345; *Qualls* v. *United States,* 149 F. 2d 891; *Sipe* v. *United States,* 80 U. S. App. D. C. 194, 150 F. 2d 984; *United States* v. *Chaplin,* 54 F. Supp. 682.

As subsequently stated in *Mormon Church* v. *United States*, 136 U. S. 1, 49, "The organization of a community for the spread and practice of polygamy is, in a measure, a return to barbarism. It is contrary to the spirit of Christianity and of the civilization which Christianity has produced in the Western world." And see *Davis* v. *Beason*, 133 U. S. 333. Polygamy is a practice with far more pervasive influences in society than the casual, isolated transgressions involved in the *Caminetti* case. The establishment or maintenance of polygamous households is a notorious example of promiscuity. The permanent advertisement of their existence is an example of the sharp repercussions which they have in the community. We could conclude that Congress excluded these practices from the Act only if it were clear that the Act is confined to commercialized sexual vice. Since we cannot say it is, we see no way by which the present transgressions can be excluded. These polygamous practices have long been branded as immoral in the law. Though they have different ramifications, they are in the same genus as the other immoral practices covered by the Act.

The fact that the regulation of marriage is a state matter does not, of course, make the Mann Act an unconstitutional interference by Congress with the police powers of the States. The power of Congress over the instrumentalities of interstate commerce is plenary; it may be used to defeat what are deemed to be immoral practices; and the fact that the means used may have "the quality of police regulations" is not consequential. *Hoke* v. *United States,* 227 U. S. 308, 323; see *Athanasaw* v. *United States,* 227 U. S. 326; *Wilson* v. *United States,* 232 U. S. 563.

Petitioners' second line of defense is that the requisite purpose was lacking. It is said that those petitioners who already had plural wives did not transport them in interstate commerce for an immoral purpose. The test laid

20

down in the *Mortensen* case was whether the transportation was in fact "the use of interstate commerce as a calculated means for effectuating sexual immorality." 322 U. S. p. 375. There was evidence that this group of petitioners in order to cohabit with their plural wives found it necessary or convenient to transport them in interstate commerce and that the unlawful purpose was the dominant motive. In one case the woman was transported for the purpose of entering into a plural marriage. After a night with this petitioner she refused to continue the plural marriage relationship. But guilt under the Mann Act turns on the purpose which motivates the transportation, not on its accomplishment. *Wilson* v. *United States, supra,* pp. 570–71.

It is also urged that the requisite criminal intent was lacking since petitioners were motivated by a religious belief. That defense claims too much. If upheld, it would place beyond the law any act done under claim of religious sanction. But it has long been held that the fact that polygamy is supported by a religious creed affords no defense in a prosecution for bigamy. *Reynolds* v. *United States, supra.* Whether an act is immoral within the meaning of the statute is not to be determined by the accused's concepts of morality. Congress has provided the standard. The offense is complete if the accused intended to perform, and did in fact perform, the act which the statute condemns, viz., the transportation of a woman for the purpose of making her his plural wife or cohabiting with her as such.

We have considered the remaining objections raised and find them without merit.

*Affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE JACKSON think that the cases should be reversed. They are of opinion that affirmance requires extension of the rule announced

in the *Caminetti* case and that the correctness of that rule is so dubious that it should at least be restricted to its particular facts.

Mr. Justice Rutledge, concurring.

I concur in the result. Differences have been urged in petitioners' behalf between these cases and *Caminetti* v. *United States,* 242 U. S. 470.[1] Notwithstanding them, in my opinion it would be impossible rationally to reverse the convictions, at the same time adhering to *Caminetti* and later decisions perpetuating its ruling.[2]

It is also suggested, though not strongly urged, that *Caminetti* was wrongly decided and should be overruled. Much may be said for this view. In my opinion that case and subsequent ones following it extended the Mann Act's coverage beyond the congressional intent and purpose, as the dissenting opinion of Mr. Justice McKenna convincingly demonstrated. 242 U. S. at 496.[3] Moreover, as I

---

[1] Counsel has emphasized the religious aspect presented by these cases and has stressed the familial aspect and purpose of so-called "celestial marriage" in the Mormon conception as distinguishing the relation in fact and in consequence from such as were involved in the *Caminetti* and other Mann Act cases. The argument from religious motivation has been foreclosed, so far as legislative power is concerned, since *Reynolds* v. *United States,* 98 U. S. 145. Apropos of the Mann Act's application, the relationship is not only illegal under state law but also as regular and continuous as that involved in *Caminetti,* or more so.

[2] See e. g., *Gebardi* v. *United States,* 287 U. S. 112; *United States* v. *Reginelli,* 133 F. 2d 595; *Christian* v. *United States,* 28 F. 2d 114. Compare *United States* v. *Beach,* 324 U. S. 193; *Mortensen* v. *United States,* 322 U. S. 369.

[3] See also the dissenting opinion of Mr. Justice Murphy herein. The dissenting opinion in the *Caminetti* case was joined by the Chief Justice and Mr. Justice Clarke. Only five justices adhered to the majority opinion, Mr. Justice McReynolds not participating. Cf. the opinion of Mr. Justice McKenna in *Athanasaw* v. *United States,* 227 U. S. 326.

also think, this legislation and the problems presented by the cases arising under it are of such a character as does not allow this Court properly to shift to Congress the responsibility for perpetuating the Court's error.

Notwithstanding recent tendency, the idea cannot always be accepted that Congress, by remaining silent and taking no affirmative action in repudiation, gives approval to judicial misconstruction of its enactments. See *Girouard* v. *United States,* 328 U. S. 61, 69. It is perhaps too late now to deny that, legislatively speaking as in ordinary life, silence in some instances may give consent.[4] But it would be going even farther beyond reason and common experience to maintain, as there are signs we may be by way of doing, that in legislation any more than in other affairs silence or nonaction always is acquiescence equivalent to action.

There are vast differences between legislating by doing nothing and legislating by positive enactment, both in the processes by which the will of Congress is derived and stated [5] and in the clarity and certainty of the expression of its will.[6] And there are many reasons, other than to indicate approval of what the courts have done, why Congress may fail to take affirmative action to repudiate their misconstruction of its duly adopted laws. Among them

---

[4] As an original matter, in view of the specific and constitutional procedures required for the enactment of legislation, it would seem hardly justifiable to treat as having legislative effect any action or nonaction not taken in accordance with the prescribed procedures.

[5] See note 4. Legislative intent derived from nonaction or "silence" lacks all the supporting evidences of legislation enacted pursuant to prescribed procedures, including reduction of bills to writing, committee reports, debates, and reduction to final written form, as well as voting records and executive approval. Necessarily also the intent must be derived by a form of negative inference, a process lending itself to much guesswork.

[6] See note 5.

may be the sheer pressure of other and more important business. See *Moore* v. *Cleveland Ry. Co.,* 108 F. 2d 656, 660. At times political considerations may work to forbid taking corrective action. And in such cases, as well as others, there may be a strong and proper tendency to trust to the courts to correct their own errors, see *Girouard* v. *United States, supra,* at 69, as they ought to do when experience has confirmed or demonstrated the errors' existence.

The danger of imputing to Congress, as a result of its failure to take positive or affirmative action through normal legislative processes, ideas entertained by the Court concerning Congress' will, is illustrated most dramatically perhaps by the vacillating and contradictory courses pursued in the long line of decisions imputing to "the silence of Congress" varied effects in commerce clause cases.[7] That danger may be and often is equally present in others. More often than not, the only safe assumption to make from Congress' inaction is simply that Congress does not intend to act at all. Cf. *United States* v. *American Trucking Assns.,* 310 U. S. 534, 550. At best the contrary view can be only an inference, altogether lacking in the normal evidences of legislative intent and often subject to varying views of that intent.[8] In short, although recognizing that by silence Congress at times may be taken to acquiesce and thus approve, we should be very sure that, under all the circumstances of a given situation, it has done so before we so rule and thus at once relieve ourselves from and

---

[7] See *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 424–425; Ribble, State and National Power Over Commerce (1937) c. X; Biklé, The Silence of Congress (1927) 41 Harv. L. Rev. 200; Powell, The Validity of State Legislation under the Webb-Kenyon Law (1917) 2 So. L. Q. 112. An example of judicial interpretation of the silence of Congress as giving consent to state legislation is *Wilson* v. *McNamee,* 102 U. S. 572, 575.

[8] Cf. note 5.

24

shift to it the burden of correcting what we have done wrongly. The matter is particular, not general, notwithstanding earlier exceptional treatment and more recent tendency. Just as dubious legislative history is at times much overridden, so also is silence or inaction often mistaken for legislation.

I doubt very much that the silence of Congress in respect to these cases, notwithstanding their multiplication and the length of time during which the silence has endured, can be taken to be the equivalent of bills approving them introduced in both houses, referred to and considered by committees, discussed in debates, enacted by majorities in both places, and approved by the executive. I doubt, in other words, that, in view of all the relevant circumstances including the unanticipated consequences of the legislation,[9] such majorities could have been mustered in approval of the *Caminetti* decision at any time since it was rendered. Nor is the contrary conclusion demonstrated by Congress' refusal to take corrective action.[10]

The *Caminetti* case, however, has not been overruled and has the force of law until a majority of this Court may concur in the view that this should be done and take action to that effect. This not having been done, I acquiesce in the Court's decision.

MR. JUSTICE MURPHY, dissenting.

Today another unfortunate chapter is added to the troubled history of the White Slave Traffic Act. It is a

---

[9] See opinion of Mr. Justice McKenna, 242 U. S. at 502, dissenting in *Caminetti* v. *United States;* see also the dissenting opinion in *United States* v. *Beach,* 324 U. S. 193, 199–200.

[10] Since the *Caminetti* decision two bills have been introduced to limit the effect of that case. S. 2438, 73d Cong., 2d Sess.; S. 101, 75th Cong., 1st Sess. Neither was reported out of committee. In such circumstances the failure of Congress to amend the Act raises no presumption as to its intent. *Order of Railway Conductors* v. *Swan,* 152 F. 2d 325, 329.

chapter written in terms that misapply the statutory language and that disregard the intention of the legislative framers. It results in the imprisonment of individuals whose actions have none of the earmarks of white slavery, whatever else may be said of their conduct. I am accordingly forced to dissent.

The statute in so many words refers to transportation of women and girls across state lines "for the purpose of prostitution or debauchery, or for any other immoral purpose." The issue here is whether the act of taking polygamous or plural wives across state lines, or taking girls across state borders for the purpose of entering into plural marriage, constitutes transportation "for any other immoral purpose" so as to come within the interdict of the statute.

The Court holds, and I agree, that under the *ejusdem generis* rule of statutory construction the phrase "any other immoral purpose" must be confined to the same class of unlawful sexual immoralities as that to which prostitution and debauchery belong. But I disagree with the conclusion that polygamy is "in the same genus" as prostitution and debauchery and hence within the phrase "any other immoral purpose" simply because it has sexual connotations and has "long been branded as immoral in the law" of this nation. Such reasoning ignores reality and results in an unfair application of the statutory words.

It is not my purpose to defend the practice of polygamy or to claim that it is morally the equivalent of monogamy. But it is essential to understand what it is, as well as what it is not. Only in that way can we intelligently decide whether it falls within the same genus as prostitution or debauchery.

There are four fundamental forms of marriage: (1) monogamy; (2) polygyny, or one man with several wives; (3) polyandry, or one woman with several husbands; and (4) group marriage. The term "polygamy" covers both

polygyny and polyandry. Thus we are dealing here with polygyny, one of the basic forms of marriage. Historically, its use has far exceeded that of any other form. It was quite common among ancient civilizations and was referred to many times by the writers of the Old Testament; even today it is to be found frequently among certain pagan and non-Christian peoples of the world. We must recognize, then, that polygyny, like other forms of marriage, is basically a cultural institution rooted deeply in the religious beliefs and social mores of those societies in which it appears. It is equally true that the beliefs and mores of the dominant culture of the contemporary world condemn the practice as immoral and substitute monogamy in its place. To those beliefs and mores I subscribe, but that does not alter the fact that polygyny is a form of marriage built upon a set of social and moral principles. It must be recognized and treated as such.

The Court states that polygamy is "a notorious example of promiscuity." The important fact, however, is that, despite the differences that may exist between polygamy and monogamy, such differences do not place polygamy in the same category as prostitution or debauchery. When we use those terms we are speaking of acts of an entirely different nature, having no relation whatever to the various forms of marriage. It takes no elaboration here to point out that marriage, even when it occurs in a form of which we disapprove, is not to be compared with prostitution or debauchery or other immoralities of that character.

The Court's failure to recognize this vital distinction and its insistence that polygyny is "in the same genus" as prostitution and debauchery do violence to the anthropological factors involved. Even etymologically, the words "polygyny" and "polygamy" are quite distinct from "prostitution," "debauchery" and words of that ilk. There is thus no basis in fact for including polygyny within the

phrase "any other immoral purpose" as used in this statute.

One word should be said about the Court's citation of *United States* v. *Bitty*, 208 U. S. 393, and the statement that the interpretation of the statute there involved is a forceful precedent for the construction of the White Slave Traffic Act. The thought apparently is that the phrase "any other immoral purpose," appearing in the White Slave Traffic Act, was derived from the identical phrase used in the statute regulating the immigration of aliens into the United States, the statute which was under consideration in the *Bitty* case. 34 Stat. 898. That case concerned itself with the portion of the immigration statute forbidding " the importation into the United States of any alien woman or girl for the purpose of prostitution, or for any other immoral purpose." Significantly, however, the statute made separate provision for the exclusion of "polygamists, or persons who admit their belief in the practice of polygamy." Thus the phrase "any other immoral purpose," following the reference to prostitution, certainly did not comprehend polygamy. And if that statute, or the interpretation given it in the *Bitty* case, is to be any authority here, the conclusion to be drawn is inconsistent with the result reached by the Court today. As a matter of fact, Congress has always referred to polygamy by name when it desired to deal with that subject, as distinguished from immoralities in the nature of prostitution. See, for example, 8 U. S. C. § 136 (f); 18 U. S. C. § 513.

The result here reached is but another consequence of this Court's long-continued failure to recognize that the White Slave Traffic Act, as its title indicates, is aimed solely at the diabolical interstate and international trade in white slaves, "the business of securing white women and girls and of selling them outright, or of exploiting them for immoral purposes." H. Rep. No. 47, 61st Cong., 2d Sess.,

28

p. 11; S. Rep. No. 886, 61st Cong., 2d Sess., p. 11.   The Act was suggested and proposed to meet conditions which had arisen in the years preceding 1910 and which had revealed themselves in their ugly details through extensive investigations.   The framers of the Act specifically stated that it is not directed at immorality in general; it does not even attempt to regulate the practice of voluntary prostitution, leaving that problem to the various states.   Its exclusive concern is with those girls and women who are "unwillingly forced to practice prostitution" and to engage in other similar immoralities and "whose lives are lives of involuntary servitude."   *Ibid.*   A reading of the legislative reports and debates makes this narrow purpose so clear as to remove all doubts on the matter.   And it is a purpose that has absolutely no relation to the practice of polygamy, however much that practice may have been considered immoral in 1910.

Yet this Court in *Caminetti* v. *United States,* 242 U. S. 470, over the vigorous dissent of Justice McKenna in which Chief Justice White and Justice Clarke joined, closed its eyes to the obvious and interpreted the broad words of the statute without regard to the express wishes of Congress.   I think the *Caminetti* case can be factually distinguished from the situation at hand since it did not deal with polygamy.   But the principle of the *Caminetti* case is still with us today, the principle of interpreting and applying the White Slave Traffic Act in disregard of the specific problem with which Congress was concerned. I believe the issue should be met squarely and the *Caminetti* case overruled.   It has been on the books for nearly 30 years and its age does not justify its continued existence. *Stare decisis* certainly does not require a court to perpetuate a wrong for which it was responsible, especially when no rights have accrued in reliance on the error.   Cf. *Helvering* v. *Hallock,* 309 U. S. 106, 121–22.   Otherwise the error

is accentuated; and individuals, whatever may be said of their morality, are fined and imprisoned contrary to the wishes of Congress. I shall not be a party to that process.

The consequence of prolonging the *Caminetti* principle is to make the federal courts the arbiters of the morality of those who cross state lines in the company of women and girls. They must decide what is meant by "any other immoral purpose" without regard to the standards plainly set forth by Congress. I do not believe that this falls within the legitimate scope of the judicial function. Nor does it accord the respect to which Congressional pronouncements are entitled.

Hence I would reverse the judgments of conviction in these cases.