**UNITED STATES of America,**
**Plaintiff**

v.

**Clarence Caylor McCLUNG, Defendant.**
**Cr. No. 27680.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 14, 1960.

Prim B. Smith, Jr., Asst. U. S. Atty., New Orleans, La., for plaintiff.

John P. Dowling, New Orleans, La., for defendant.

J. SKELLY WRIGHT, District Judge.

The two-count indictment here purports to charge separate violations of the White Slave Traffic Act.[1] 18 U.S.C. § 2421.[2] Though the acts alleged are six months apart and involve different girls, both counts are substantially identical. Each accuses the defendant of having transported a woman across state lines "for an immoral purpose, to-wit, for the purpose of engaging in sexual intercourse and other sexual acts with her."[3]

---

[1]. Official title of the Act of June 25, 1910, c. 395, 36 Stat. 825. See Section 8 thereof. Also popularly known as the "Mann Act" after the author of the bill.

[2]. The relevant part of the statute reads:
"Whoever knowingly transports in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice;
\* \* \*
\*　　\*　　\*　　\*　　\*
"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

[3]. Except for the formal parts, the full text of the indictment is:
"Count I
"That on or about August 25, 1957, at LaPlace, Louisiana, in the New Orleans Division of the Eastern District of Louisiana, one Clarence Caylor McClung did unlawfully, knowingly, wilfully and feloniously transport and cause to be transported in interstate commerce a certain girl, to-wit, Lula Belle Raub, from Huntington, West Virginia, to LaPlace, Louisiana, for an immoral purpose, to-wit, for the purpose of engaging in sexual intercourse and other sexual acts with her.
"Count II
"That on or about January 19, 1958, at LaPlace, Louisiana, in the New Orleans Division of the Eastern District of Louisiana, one Clarence Caylor McClung did unlawfully, knowingly, wilfully and feloniously transport and cause to be transported in interstate commerce a certain girl, to-wit, Barbara Jean Raub, from Huntington, West Virginia, to LaPlace, Louisiana, for an immoral purpose, to-wit, for the purpose of engaging in sexual intercourse and other sexual acts with her."

The question presented is whether the conduct alleged falls within the prohibition of the Act.

A close examination of the language of the indictment shows:

*First.* The defendant is not charged with engaging in a sordid commercial scheme. There is no intimation that he was acting for pecuniary gain.

*Second.* No accusation is made that the defendant accomplished his purpose by force or threats, or deceit, or even by persuasion. He is not charged with having *victimized* either of the girls in question. So far as the indictment shows, each was a willing accomplice who freely consented to all that occurred.

*Third.* The wording of the indictment in no way indicates that the women were debauched or depraved. It is not charged that the defendant brought about their fall from virtue, or in any manner lowered their moral character. For ought that appears, the alleged "victims" may even have been rescued from the depths of depravity to a somewhat less immoral life by defendant's intercession.

*Fourth.* In each count the indictment recites only a single, isolated instance of intercourse, albeit preceded, accompanied, or followed by unspecified "other sexual acts" which are so vaguely stated that no account can be taken of them. There is no allegation that the defendant intended to establish the woman as his mistress or concubine or that he induced her to assume any other immoral status on a permanent or habitual basis. The inference is left open that all there was to the affair, and all that was ever contemplated, was the single act.

■ *Fifth.* Finally, though the characterization of the act as "immoral" implies that neither woman involved was the defendant's wife,[4] there is no allegation that either of them was married to anyone else, or that he was, so as to brand their relationship adulterous. And though in each count the "victim" is called a "girl," nothing shows that she was of such tender age as to render the defendant guilty of so-called "statutory rape."[5] There is no indication that any offense against the criminal laws of the state to which the parties repaired was committed.[6]

Thus, so far as the indictment shows, on two occasions the defendant brought an unattached and willing woman across state lines for a casual affair and she did not suffer from the experience. Is he the evil "trafficker" the Mann Act condemns or she the "white slave" it was designed to protect?

It is true that the Supreme Court,[7] albeit over eloquent dissent,[8] has held the

---

4. As to the second count, defendant's motion to dismiss alleges that the woman there described was in fact his wife at the time of the offense charged and a marriage certificate in the record tends to bear out this claim. But since that allegation can in no event affect the first count of the indictment, for the purpose of this opinion it is assumed that neither woman was married to defendant.

5. In Louisiana the "age of consent" is 17 years complete. LSA–R.S. 14:80. If the girls had been under 18, presumably the indictment here would have charged a violation of Section 2423, which carries a higher maximum penalty, rather than Section 2421 of Title 18.

6. Unlike some states, Louisiana knows no crime of "fornication."

7. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442; Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12.

8. In Caminetti, joined by Chief Justice White and Justice Clarke, Mr. Justice McKenna said: " * * * [The judicial function] should not shut its eyes to the facts of the world and assume not to know what everybody else knows. And everybody knows that there is a difference between the occasional immoralities of men and women and that systematized and mercenary immorality epitomized in the statute's graphic phrase 'White-slave traffic.' And it was such immorality that was in the legislative mind, and not the other. The other is occasional, not habitual—inconspicuous—does not offen-

Act applicable to the transportation of a woman for non-commercial purposes and that other courts [9] have given it very broad scope, perhaps "beyond that intended by the legislative framers." [10] But neither Caminetti [11] nor Cleveland,[12] nor any other case, has applied the provision to the bare facts alleged here. In the absence of compelling precedent this court must refuse to violate both the letter and the spirit of the enactment.

■ The Act condemns the interstate transportation of a woman or girl "for the purpose of prostitution or debauchery, or for any other immoral purpose." 18 U.S.C. § 2421. There is no allegation that prostitution was contemplated. Nor is it charged that either of the girls in question would be "debauched," a term which implies seduction from virtue to a depraved state.[13] The indictment here rests squarely on the statutory language "any other immoral purpose." It may be doubted whether such vague language is sufficient to define a criminal offense.[14] At best, it would seem that the words "any other immoral purpose" should be restricted to conduct of the *same character* as prostitution and debauchery.[15] This is a limited category, encompassing only the more notorious or vicious sexual immoralities. Certainly, it cannot rightly be said to include a single act of intercourse as here alleged.

■ But even if the words "immoral purpose" are not so circumscribed, the

---

sively obtrude upon public notice. Interstate commerce is not its instrument as it is of the other, nor is prostitution its object or its end. It may, indeed, in instances, find a convenience in crossing state lines, but this is its accident, not its aid." 242 U.S. at page 502, 37 S.Ct. at page 201.

In Cleveland, Mr. Justice Murphy said: "Today another unfortunate chapter is added to the troubled history of the White Slave Traffic Act. It is a chapter written in terms that misapply the statutory language and that disregard the intention of the legislative framers. It results in the imprisonment of individuals whose actions have none of the earmarks of white slavery, whatever else may be said of their conduct. * * *" 329 U.S. at page 24, 67 S.Ct. at page 18. Mr. Justice Black and Mr. Justice Jackson also dissented. 329 U.S. at page 20, 67 S.Ct. at page 16. See also, concurring opinion of Mr. Justice Rutledge which expresses strong disapproval for the rule of Caminetti v. United States, which is followed here. 329 U.S. at page 21, 67 S.Ct. at page 17.

9. See, e. g., Carey v. United States, 8 Cir., 265 F. 515; Mellor v. United States, 8 Cir., 160 F.2d 757; Daigle v. United States, 1 Cir., 181 F.2d 311; Dunn v. United States, 10 Cir., 190 F.2d 496; United States v. Amadio, 7 Cir., 215 F. 2d 605; Brown v. United States, 8 Cir., 237 F.2d 281.

10. See Mortensen v. United States, 322 U.S. 369, 377, 64 S.Ct. 1037, 1042, 88 L.Ed. 1331.

11. In Caminetti the defendant was charged with transporting a woman for the purpose of making her his concubine or mistress.

12. In Cleveland defendants were charged with transporting their "plural" or polygamous wives.

13. The transitive verb is so defined by all the authorities. See, e. g., Webster's New International Dictionary (2d ed. 1951): " * * * to lead away from purity, virtue, or excellence; to corrupt in character or principles; * * *"; The Shorter Oxford Dictionary (3d ed. rev'd 1955): "To seduce from virtue or morality; to corrupt."; Funk & Wagnalls' New Practical Standard Dictionary (Brittanica World Language Ed. 1957): "To make or become corrupt in morals; lead astray; * * * seduce; * * *"; Bouv., Law Dict., Rawle's Third Revision p. 783 (8th ed. 1914): " * * * to seduce and vitiate a woman." If the term "debauchery" as used in the Act is intended to describe the immoral practice in which the woman engages rather than her seduction, the acts alleged in the indictment come no closer to fitting this definition. There is no indication that they involved "excessive" (Webster's) or "vicious" (Oxford) indulgence in sexual pleasures.

14. See United States v. Hobbs, D.C.Fla., 287 F. 157.

15. See Cleveland v. United States, supra, 329 U.S. 18, 67 S.Ct. 15; United States v. Lewis, 7 Cir., 110 F.2d 460, 462.

Act makes clear that the only type of immorality intended is that which is habitual.[16] The inference is unmistakable that what the drafters of the Act had in mind was an immoral *status* of some duration. They gave their meaning when they described the immoral conduct as a "practice" and referred to the victim as being induced to "give herself up" to it. If any further proof of congressional intent is required, the most cursory examination of the legislative history of the White Slave Traffic Act will furnish it.[17] Without attempting to delimit exactly the scope of this enactment, it is clear enough that the conduct charged here does not fall within its proscription.

Though it should not be necessary, it may be well to add a word for the benefit of those who sometimes forget the limitations of the judicial function. Let no one read here an apology for the conduct charged against the present accused.[18] This court cannot condone or deprecate. It is no censor of morals, but only a court of law, and, though of common origin, morality and legality are not always the same. Nor yet do judges make the law. Approve or not, the court must apply the statutes which others have written. Accordingly, the only conclusion reached here is that the congressional enactment known as the White Slave Traffic Act does not condemn as criminal the acts alleged in the indictment.

Judgment accordingly.

16. It may be noted that both Caminetti and Cleveland involved not a single incident, or even an occasional affair, but a relationship of some duration. See notes 11 and 12, supra.

17. See H.R. Report No. 47, 61st Cong., 2d Sess., particularly pp. 2, 9–12; S. Report No. 886, 61st Cong., 2d Sess., particularly pp. 1–2, 10–12 (this Report is reprinted in 45 Cong.Rec. 9037–9041, the cited passages appearing at 9040). For House debates, see 45 Cong.Rec. 804–823, 1030–1041, particularly at 805, 811,

818, 821, 1035, 1037, 1040. The House Bill (No. 12315) was passed by the Senate without amendment or debate. 45 Cong.Rec. 9037.

18. Much less is any comment intended on the actual behavior of the defendant in this case, which may have been altogether innocent or vicious in the extreme. The only question before the court is the sufficiency of an indictment whose allegations may or may not reflect the true facts.