## ATHANASAW AND SAMPSON *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF FLORIDA.

No. 588.  Argued January 7, 8, 1913.—Decided February 24, 1913.

*Hoke* v. *United States, ante,* p. 308, followed to effect that the White
   Slave Traffic Act of June 25, 1910, is constitutional.
The White Slave Traffic Act of 1910 against inducing women and girls
   to enter upon a life of prostitution or debauchery covers acts which
   might ultimately lead to that phase of debauchery which consists in
   sexual actions; and in this case *held* that there was no error in refus-
   ing to charge that the gist of the offense is the intention of the person
   when the transportation is procured, or that the word "debauchery"
   as used in the statute means sexual intercourse or that the act does
   not extend to any vice or immorality other than that applicable to
   sexual actions.

THE facts, which involve the constitutionality and con-
struction of the White Slave Act and validity of an in-
dictment and conviction thereunder, are stated in the
opinion.

Mr. *W. A. Carter* and *John P. Wall* filed a brief for
plaintiffs in error:

   The White Slave Act is unconstitutional, because it
violates § 2, Art. IV, of the Constitution of the United

States. *Crandall* v. *State of Nevada*, 6 Wall. 35; *Joseph* v. *Randolph*, 71 Alabama, 499; *Paul* v. *Virginia*, 8 Wall. 168; 2 Tucker on the Constitution, 256, 530, paragraph D; *United States* v. *Harris*, 106 U. S. 629.

Power to pass the White Slave Act is not granted to the Federal Congress by the commerce clause of the Constitution. See Tucker on the Constitution, p. 528.

The White Slave Act conflicts with the Ninth and Tenth Amendments to the Constitution and infringes on the reserved police powers of the State. *City of New York* v. *Miln*, 11 Pet. 102; *Howard* v. *I. C. R. Co.*, 207 U. S. 463; *Keller* v. *United States*, 213 U. S. 138; *Lottery Cases*, 188 U. S. 22; *State* v. *Ry. Co.*, 27 W. Va. 783.

In their decisions sustaining the act, the lower Federal courts in *Bennett* v. *United States*, 194 Fed. Rep. 630; *Kalen* v. *United States*, 196 Fed. Rep. 888; *United States* v. *Westman*, 182 Fed. Rep. 1017; *United States* v. *Warner*, 188 Fed. Rep. 682, have misconstrued the commerce clause of the Constitution.

As to the errors assigned upon the charges given and refused by the court, see Anderson's Law Dict. 314; 1 Abbott's Law Dict. 348; 2 Lewis' Suth. Stat. Const., 2d ed., § 442.

*Mr. Assistant Attorney General Harr* for the United States.[1]

Mr. Justice McKenna delivered the opinion of the court.

Indictment for violating the act of Congress of June 25, 1910, known as the White Slave Act. 36 Stat. 825, c. 395.

The charge is that the defendant transported or caused to be transported, or aided in the transportation of a girl

[1] See abstract of argument for the United States in *Hoke* v. *United States, ante,* p. 313.

by the name of Agnes Couch from Atlanta, Georgia, to Tampa, Florida, for the purpose of debauchery.

A crime is variously charged against §§ 2 and 3 of the act in thirty-nine counts, alleging that the transportation was for "the purpose of debauchery" or "to give herself up to debauchery."

A demurrer was filed to the indictment, alleging as grounds thereof the unconstitutionality of the act and that the indictment was insufficient in certain particulars of fact. The demurrer was overruled, and after a trial upon a plea of not guilty defendants were convicted. Defendant Athanasaw was sentenced to imprisonment for two years and six months and the defendant Sampson for one year and three months. The contentions of the defendants are that the act of Congress is unconstitutional and that errors were committed by the District Court in giving and refusing to give certain instructions to the jury.

1. This case was argued and submitted with No. 381, *Hoke* v. *United States, ante,* p. 308. The constitutionality of the law was sustained in that case, and further discussion is unnecessary.

2. To understand the ruling of the court on the instructions an outline of the facts must be stated. Agnes Couch was a girl of seventeen years. She lived at Suwanee, Georgia; but, being in Atlanta in September, 1911, and seeing an advertisement by one Sam Massel for chorus girls, she applied at his office and signed a contract to appear with the Imperial Musical Comedy Company at the Imperial Theatre, Tampa, Florida, as a chorus girl at a salary of $20 a week for the first four weeks and $15 a week thereafter, she to room and board in the theatre. The theatre was operated by the defendants, and Massel acted as their booking representative at Atlanta. After she signed the contract Massel gave her a railroad ticket which had been provided by the defendants for that

purpose. She arrived at Tampa about 6:30 a. m. and met the defendant Athanasaw at seven o'clock.

As to what then took place, the girl testified as follows: "He showed me my room, and took the check to get my trunk. I went to sleep and slept until 2 o'clock in the afternoon. At that hour one of the girls awoke me up to rehearse. I went down in the theatre and stayed there about an hour rehearsing, singing; and then went to lunch in the dining room. All of the girls were there, and several boys. I had never had any stage experience. At lunch they were all smoking, cursing, and using such language I couldn't eat. After lunch I went to my room, and about 6 o'clock Louis Athanasaw, one of the defendants, came and said to me I would like it all right; that I was good looking and would make a hit, and not to let any of the boys fool me, and not be any of the boys' girl; to be his. He wanted me to be his girl; to talk to the boys and make a hit, and get all of the money I could out of them. His room was next to mine, and he told me he was coming in my room that night and sleep with me; and he kissed and caressed me. He told me to dress for the show that night and come down into the boxes. I went into the box about 9 o'clock. About that time Louis Athanasaw's son knocked on my door and told me to come to the boxes. In the box where I went there were four boys; they were smoking, cursing, and drinking. I sat down and the boys asked me what was the matter, I looked scared. I told them I was ashamed of being in a place like that; and Arthur Schlemann, one of the boys, said he would take me out. The others insisted on my staying, and said I would like it when I got broke in. I tried to go out with Schlemann, but a boy named Gilbert pulled me back, saying 'Let that cheap guy alone.' Schlemann said he would send a policeman, and in about 15 minutes Mr. Thompson and Mr. Evans came in for me."

Athanasaw denied that he made improper proposals to the girl, and it was testified that at the preliminary hearing she did not charge him with such. In all else, however, her testimony was not contradicted and it was supported as to the character of the house and as to what took place.

Three propositions are presented by defendants: (1) The gist of the offense is the intention of the person when the transportation was procured or aided to be procured. (2) The word "debauchery" as used in the statute means sexual intercourse. (3) The act did not intend to prohibit the transportation of women for the purpose of any other vice or immorality than that applicable to sexual actions.

The instructions requested by the defendants presented these propositions, and by refusing them and giving others inconsistent with them it is contended that the court erred. The ruling of the court is sufficiently exhibited by the instructions which it gave, and they can be made the basis as well of a consideration of the errors assigned by the refusal of the instructions requested by defendants.

The instructions given by the court are as follows:

"The intent and purpose of the defendants at the time of the furnishing of this transportation for Agnes Couch is the very gist and question of this case. Did they intend to induce or entice or influence her to give herself up to debauchery? It makes no difference whether the profits which would be made by the defendants came from the sale of liquor or other immoral purpose. The question here is of intent; what was the intent with which they brought her; that she should live an honest, moral and proper life? or that she came and they engaged and contracted with her for the purpose of her entering upon a condition which might be termed debauchery, or tends to or would necessarily and naturally lead her to a condition of debauchery just referred to?

"The term debauchery is not a legal or technical term. There is no allegation that the defendants brought her

here with the purpose or with the intent to debauch her; but to induce her or entice her, or influence her to enter upon a course of debauchery. The term debauchery is not a legal or technical term. To debauch is to corrupt in morals or principles; to lead astray morally into dishonest and vicious practices; to corrupt; to lead into unchastity; to debauch. Debauchery then, is an excessive indulgence of the body; licentiousness, drunkenness, corruption of innocence, taking up vicious habits. The term debauchery, as used in this statute, has an idea of sexual immorality; that is, it has the idea of a life which will lead eventually or tends to lead to sexual immorality; not necessarily drunkenness or immorality, but here it leads to the question in this case as to whether or not the influences in which this girl was surrounded by the employment which they called her to, did not tend to induce her to give herself up to a condition of debauchery which eventually, necessarily and naturally would lead to a course of immorality sexually. That is the question for you to determine, and it is a question that you alone can determine. You have heard the testimony in the case in regard to the circumstances in which she was placed. You have viewed the scene where she was employed. You have examined by the testimony and your observation what was the character and what was the condition or influences in which the girl was placed by the defendants. Was or was not it a condition that would necessarily and naturally lead to a life of debauchery of a carnal nature relating to sexual intercourse between man and woman?

"Now, it is contended that they must have had a deliberate intent to debauch her when she came here; that either one or the other intended to debauch her or to get somebody else to debauch her. Now that term debauch is used in a great many instances in law, and the usual connection is to have carnal intercourse with; but there is no such language in this statute, nor is it the language of

the indictment. The charge of the indictment in sub-
stance is that they induced or influenced her to enter into
a life or condition of debauchery,—'to induce or compel
her to give herself up to debauchery.' ''

The language of the statute is directed against the trans-
portation ''of any woman or girl for the purpose of prosti-
tution or debauchery, or for any other immoral purpose,
or with the intent and purpose to induce, entice, or compel
such woman or girl to become a prostitute or to give
herself up to debauchery, or to engage in any other im-
moral practice.''

The instructions of the court were justified by the stat-
ute. It is true that the court did not give to the word
debauchery or to the purpose of the statute the limited
definition and extent contended for by defendants, nor
did the court make the guilt of the defendants to depend
upon having the intent themselves to debauch the girl or
to intend that some one else should do so. In the view of
the court the statute had a more comprehensive prohibi-
tion and was designed to reach acts which might ul-
timately lead to that phase of debauchery which consisted
in ''sexual actions.'' The general expressions of the court,
however, were qualified to meet and not go beyond the
conduct of the defendants. The court put it to the jury
to consider whether the employment to which the de-
fendants called the girl and the influences with which they
surrounded her tended ''to induce her to give herself up
to a condition of debauchery which eventually and
naturally would lead to a course of immorality sexually.''
That question, the court said, the jury should determine,
and further ''You have heard the testimony in the case
in regard to the circumstances in which she was placed.
You have viewed the scene where she was employed. You
have examined by the testimony and your observation
what was the character and what was the condition or
influence in which the girl was placed by the defendants.

Was or was not it a condition that would necessarily and naturally lead to a life of debauchery of a carnal nature relating to sexual intercourse between man and woman?" The plan and place justified the instructions. The plan might have succeeded if the coarse precipitancy of one of the defendants and the ribaldry of the habitues of the place had not shocked the modesty of the girl. And granting the testimony to be true, of which the jury was the judge, the employment to which she was enticed was an efficient school of debauchery of the special immorality which defendants contend the statute was designed to cover.

*Judgment affirmed.*