UNITED STATES of America,
Plaintiff-Appellee,

v.

Sylvester MARKS, Defendant-Appellant.
No. 12650.

United States Court of Appeals
Seventh Circuit.

Dec. 14, 1959.

George Cohan, Gary, Ind., Jason Ernest Bellows, Chicago, Ill., Robert G. Estill, Estill & Williams, East Chicago, Ind. (Charles A. Bellows, Chicago, Ill., of counsel), for appellant.

Kenneth C. Raub, U. S. Atty., Fort Wayne, Ind., George Vann, Asst. U. S. Atty., Gary, Ind., Martin H. Kinney, Asst. U. S. Atty., Hammond, Ind., Charles R. LeMaster, Asst. U. S. Atty., Fort Wayne, Ind., for appellee.

Before HASTINGS, Chief Judge, CASTLE, Circuit Judge, and PLATT, District Judge.

PLATT, District Judge.

The defendant, Sylvester Marks, appeals from a judgment finding him guilty after a trial to the court. He waived indictment and jury trial. The information charged:

"On or about the 26th day of January, 1959, in the Northern District of Indiana, Sylvester Marks did knowingly transport Joyce Meeks, a girl, from East Chicago, State of Indiana, to Chicago, State of Illinois, for the purpose of debauchery and for other immoral purposes, and the intent and purpose to induce, entice and compel said Joyce Meeks to give herself up to debauchery and to engage in other immoral practices, in violation of Section 2421, Title 18 of the United States Code."

The defendant contends here that:

(1) There was a fatal variance between the charge in the information and the proof;

(2) The evidence is insufficient even when considered in the light most favorable to the Government to sustain defendant's guilt; and

(3) The trial court erred in permitting the Government to impeach its own witness where the Government was not surprised by the testimony of its own witness; and that the evidence which was introduced to impeach the witness was not admissible and only served to prejudice the trial court against the defendant.

The evidence discloses that the defendant Marks resided in East Chicago, Indiana, and was 41 years old. He and his wife Doris, to whom he was not legally married, occupied an apartment on the second floor of a building which he owned. There were three or four other rooms, two of which were rented to Louise Kenny and Linda Truman, neither of whom had legitimate employment. On the first floor there was a laundromat on one side and the defendant operated a coffee-shop on the other. One Jim Kimbrough, who was the manager or leased the laundromat, introduced Joyce

Meeks to the defendant on January 20 or 21, 1959. She was 16 years of age although she looked older. Kimbrough asked the defendant "if [she] would do" and the defendant replied "[she] would more than do." The defendant gave her a card with his telephone numbers on it, and told her to call him the next afternoon. That same afternoon she had an argument with her mother, packed her clothes, left and stayed in a hotel overnight by herself. The next day a friend took her to the bus station in Gary where she called the defendant and asked him if she could have the job, because she and her father and mother did not get along, and she had no place to stay. In response to the call he came to the bus station in his car, drove her to the hotel where she obtained her clothes and then went to the defendant's apartment. They arrived there about five or six in the evening. He introduced her to his wife, they sat around and had something to drink. She slept in the spare bedroom of the apartment. Later he took her to night-clubs in the vicinity where they danced and drank. The defendant told her not to leave the house as the police might be suspicious of a white girl in his apartment. The defendant told Joyce that he was running a house of prostitution, although he denied this in his testimony. At the apartment she had a conversation with the two girls who talked about the "tricks they turned, and about the money they made."

On Sunday, the 25th, in the afternoon, the defendant drove Joyce to see two friends, James and Betty Scott, who lived on Drexel Boulevard in Chicago. They left about five or five-thirty in the defendant's automobile. When they arrived at Scotts' apartment, they talked and drank, and later went back to East Chicago. About 11:00 p. m. they again drove to Chicago and went first to the Southerland Lounge and had a drink. The defendant seemed well acquainted at this place. He kept making phone calls. They stayed a couple of hours and went to McKie's Disc Jockey Show Lounge which was a bar on the south side of Chicago. They had a drink and he said he was not making a double trip, that they were going to stay at a hotel. Joyce refused to stay in a hotel with him and wanted to go back. He demanded that she stay at the hotel with him. They drove to one hotel, she refused to get out and he used violent language. They then went to another hotel where she again refused. He insisted and they went in and he registered. The Manager showed them to a room, they went to bed and had intercourse, which she claimed was against her will. The defendant testified that he went to the room with her and remained there, but he neither disrobed nor had intercourse. They arrived at the hotel about four or four-thirty in the morning. They left about 10:00 a. m. the same day, and drove back to East Chicago. He then directed her to pack her clothes because they were going back to Scott's place, and said that "he was trying to get [her] lined up in the Blue Note or some kind of a place, to work as a prostitute." They again drove to Scott's apartment and had a drink. Joyce said Betty told her that "she was waiting for a trick and she would try to work it into a party" to include her. Betty's customer arrived and she shut the door so that he could not see the defendant or Joyce. She was in the bedroom with him about one-half hour when she came out and handed her husband $20.00. The defendant Marks left Joyce at the apartment. Betty told her that she worked at the "DeSable Lounge" and also in the loop where "she met tricks on the street." Joyce testified that Scott told her "he operated a gambling joint." She also testified that Betty told her about prostitution. The next day the defendant came to the Scotts' apartment and said that her Mom and Dad had been to his house and told him that Joyce was a minor, had run away from home, and they wanted her home. He said "he wanted to get off the hook." He drove her to the bus station in Gary and gave her $6.00. About midnight Joyce took a bus back to Chicago and a cab to the Scotts' apartment. Scott took her to a

hotel in Chicago and told her that she was to work as a prostitute, that the bellboy would make the appointments for her, and she was to pay a portion of what she received to the bellboy. Later she called Betty, said she had changed her mind and wanted to leave. Betty told her that Scott would get in touch with her. The bellboy came to her room, told her that Scott was downstairs, and wanted her to pack her clothes. She packed her clothes, went downstairs where she met Scott, and he took her to a car where there were two Chicago Detectives.

The defendant, in his testimony, denied that he had taken Joyce to Chicago to be a prostitute but admitted that he had had intercourse with her in his apartment in Gary. He testified that when they were at Scott's the first time he said "what do you think of my new girl?" He also testified he kept her at his apartment until Kimbrough could give her a job at the laundromat. The defendant admitted that he had been convicted of several misdemeanors, including keeping a house of ill fame on February 25, 1958, but denied he was running such a house.

Mrs. Betty Scott, a Government witness, testified that Marks did bring Joyce Meeks to their apartment on two occasions, and that she told her about personal hygiene because she had just had a baby, but not about prostitution. Mrs. Scott denied that she was a prostitute.

James Scott, also testifying for the Government, said he was an automobile salesman and bartender, and had known Marks for four or five years; that Marks brought Joyce to their apartment in January, and said "how do you like my new girl?" He denied that he made any contact with a bellboy for Joyce to work as a prostitute. Scott denied that Marks requested him to make contacts for Joyce in Chicago to engage in prostitution. The court permitted the Government to cross-examine Scott regarding certain statements he made to a Special Agent of the Federal Bureau of Investigation. The Special Agent was permitted to testify to statements made to him contrary to Scott's testimony.

The defendant first contends that there was a fatal variance between the charge in the information and the proof. The defendant maintains that the Government attempted to prove that Marks transported Joyce for the purpose of prostitution. The information did charge transportation for the purpose of debauchery. Debauchery as used in the Mann Act is a broad term and includes all sexual immoralities, whether for hire or not for hire, or for cohabitation. Cleveland v. United States, 1946, 329 U.S. 14, 17, 67 S.Ct. 13, 91 L.Ed. 12. Also see Athanasaw v. United States, 1913, 227 U.S. 326, 33 S.Ct. 285, 57 L.Ed. 528. Prostitution " 'Of women [means] : The offering of the body to indiscriminate lewdness for hire. * * * ' " Cleveland v. United States, supra [329 U.S. 14, 67 S.Ct. 15]. The statute is aimed at prevention of transportation of a female in interstate commerce for purpose of commercial and non-commercial vice. Malaga v. United States, 1 Cir., 1932, 57 F.2d 822.

The evidence portrays that the defendant pursued a course of conduct intending to lead Joyce Meeks into a life of debauchery, that is, sexual immorality. He took her into his home, where he admittedly had intercourse with her, and where resided two women of questionable character. He then suggested that they were going to Chicago to place her in a house of prostitution. From these acts it is reasonable to infer that he intended to entice her to give herself up to debauchery at the time of the transportation from Indiana to Illinois. The acts before and after the transportation were competent as bearing on the element of intent. Ammerman v. United States, 8 Cir., 1917, 262 F. 124; Jarabo v. United States, 1 Cir., 1946, 158 F.2d 509.

The defendant in his argument overlooks the gravamen of the offense charged. The crime is complete the moment the female has been transported across the state line with the intent to en-

tice her into debauchery. Proof that he accomplished his illicit purpose is not necessary to conviction. Batsell v. United States, 8 Cir., 1954, 217 F.2d 257; Cleveland v. United States, 1946, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12.

 There is no variance in the proof in this case although it would have sustained a charge of transportation for the purpose of prostitution. Moreover, if the Government had relied solely on the transportation to Chicago when Joyce Meeks claimed that the defendant had intercourse with her there was sufficient proof to sustain the charge "for the purpose of debauchery." Brown v. United States, 8 Cir., 1956, 237 F.2d 281. Defendant's counsel did not require the Government to elect upon which transportation it relied, nor did he object to the evidence of three transportations.

The evidence in this case when viewed in the light most favorable to the Government is certainly sufficient to sustain the conviction. The credibility of witnesses was entirely for the trial court. The testimony of Joyce Meeks corroborated in various details by the testimony of the defendant, as well as by other witnesses, was sufficient to prove the defendant guilty beyond a reasonable doubt.

This brings forward the defendant's final contention, that the court should not have permitted the Government to impeach its witness Scott. Scott was interviewed by a Special Agent of the Federal Bureau of Investigation prior to the trial and gave statements contrary to portions of his testimony. The determination of whether he was a hostile witness and whether the Government should have been permitted to impeach Scott was within the discretion of the trial court. It heard and saw him testify. Stevens v. United States, 9 Cir., 1958, 256 F.2d 619. Furthermore, the hearsay which was permitted in evidence to impeach Scott was not considered by the court as substantive evidence against the defendant. The record discloses as follows:

"The Court: The only purpose of its being received is to impeach the government witness, and it is confined to that. I cannot, and should not, receive this evidence for the purpose of determining the guilt or innocence of the defendant, only insofar as it may reflect credibility upon the government's own witness.

"Mr. Estill: [Defendant's counsel] Of course, I could have no objection to this evidence if it is not going to be applied as proof against the defendant."

The record presents no reversible error. The judgment of the district court is affirmed.