UNITED STATES of America
v.
William Michael AUSTREW also known as Bill Davis

Harold Sapperstein
and
Anne Sapperstein.
Crim. No. 24648.

United States District Court
D. Maryland.
Feb. 26, 1962.

Joseph D. Tydings, U. S. Atty., John G. Underwood, and Carl J. Lorenz, Jr., Asst. U. S. Attys., Baltimore, Md., for plaintiff.

Nathan M. Cohen, Chicago, Ill., for defendant Austrew.

William F. Mosner, Towson, Md., for defendants Sapperstein.

NORTHROP, District Judge.

The defendant, William Michael Austrew, alias Bill Davis, together with Harold Sapperstein and Anne Sapperstein, his wife, is charged in a four count in-

dictment[1] with violations of the White Slave Traffic Act, 18 U.S.C.A. §§ 2421, 2422 and 2423[2]; also, all of the named defendants are charged in all of the

1. The indictment reads as follows:

"FIRST COUNT: The Grand Jury for the District of Maryland charges:

"On or about the 13th day of July, 1957, in the District of Maryland,

WILLIAM MICHAEL AUSTREW, also known as BILL DAVIS, HAROLD SAPPERSTEIN,
and
ANNE SAPPERSTEIN

did knowingly procure and obtain Capital Airlines tickets to be used by certain girls, to wit; * * * Shirley Monroe, and Gladys Germaine Moyers, also known as Betty McLean, in interstate commerce, in going to Calumet City, Illinois, for the purpose of prostitution, debauchery, and other immoral purposes, and with the intent and purpose on the part of the said WILLIAM MICHAEL AUSTREW, also known as BILL DAVIS, HAROLD SAPPERSTEIN and ANNE SAPPERSTEIN, to induce, entice and compel the said girls to give themselves up to the practice of prostitution and to give themselves up to debauchery and other immoral practices, whereby the said girls were transported in interstate commerce.

"SECOND COUNT: And the Grand Jury for the District of Maryland further charges:

"On or about the 13th day of July, 1957,

WILLIAM MICHAEL AUSTREW, also known as BILL DAVIS, HAROLD SAPPERSTEIN,
and
ANNE SAPPERSTEIN

did knowingly persuade, induce, entice and coerce certain girls, to wit, * * * Shirley Monroe, and Gladys Germaine Moyers, also known as Betty McLean, each of whom had not then attained her eighteenth birthday, to go from Friendship Airport, in the State and District of Maryland, to Milwaukee, Wisconsin, by common carrier, to wit, Capital Airlines, in interstate commerce, with intent that the said girls be induced and coerced to engage in prostitution, debauchery, and other immoral practices.

"THIRD COUNT: And the Grand Jury for the District of Maryland further charges:

"On or about the 11th day of July, 1957, in the District of Maryland,

WILLIAM MICHAEL AUSTREW, also known as BILL DAVIS, HAROLD SAPPERSTEIN,
and
ANNE SAPPERSTEIN

did knowingly procure and obtain a Capital Airlines ticket to be used by a certain girl, to wit, Dora Estelle Heathcote, also known as Laura Anderson, also known as Sandra Lester, in interstate commerce, in going to Calumet City, Illinois, for the purpose of prostitution, debauchery, and other immoral purposes, and with the intent and purpose on the part of the said WILLIAM MICHAEL AUSTREW, also known as BILL DAVIS, HAROLD SAPPERSTEIN, and ANNE SAPPERSTEIN, to induce, entice, and compel the said girl to give herself up to the practice of prostitution, and to give herself up to debauchery and other immoral practices, whereby the said girl was transported in interstate commerce.

"FOURTH COUNT: And the Grand Jury for the District of Maryland further charges:

"On or about the 11th day of July, 1957,

WILLIAM MICHAEL AUSTREW, also known as BILL DAVIS, HAROLD SAPPERSTEIN,
and
ANNE SAPPERSTEIN

did knowingly persuade, induce, entice, and coerce a certain girl, to wit, Dora Estelle Heathcote, also known as Laura Anderson, also known as Sandra Lester, to go from Friendship Airport, in the State and District of Maryland, to Chicago, Illinois, in interstate commerce, for the purpose of prostitution and debauchery and for other immoral purposes, and with the intent and purpose on the part of the said WILLIAM MICHAEL AUSTREW, also known as BILL DAVIS, HAROLD SAPPERSTEIN and ANNE SAPPERSTEIN, that the said girl should engage in the practice of prostitution and debauchery and other immoral practices, and thereby the said WILLIAM MICHAEL AUSTREW, also known as BILL DAVIS, HAROLD SAPPERSTEIN, and ANNE SAPPERSTEIN, did knowingly cause the said girl to go and to be carried and transported as a passenger upon the lines and routes of common carriers in interstate commerce, to wit, National Airlines and Capital Airlines."

2. Chapter 117—White Slave Traffic

"§ 2421. Transportation generally

"Whoever knowingly transports in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or com-

counts as principals under the Aiding and Abetting Section, 18 U.S.C.A. § 2.

A motion for separate trials, made on behalf of Austrew, was granted on September 26, 1961, and the Sappersteins were tried before Chief Judge Thomsen of this court and convicted on all four counts. United States v. Sapperstein, 198 F.Supp. 147 (D.Md.1961).

Austrew was tried without a jury commencing on October 25, 1961. At the conclusion of the evidence and upon the request of counsel on both sides, permission was granted for all argument and rebuttal to be made in the form of written memoranda; this accounts for much of the delay in the rendition of this opinion and verdict.

### FINDING OF FACTS

Austrew is the manager and lessee of a night club owned by Amos Amadio, known as the Derby Club, in Calumet City, Illinois. One of apparently many such clubs in this town just outside of Chicago, the Derby Club provides an outlet for its patrons' taste for alcohol, strip-dancing, sexual intercourse, and other illicit low-life activities. Though there was some conflict in the evidence on this point, it is reasonably clear that there was a cot in a rear room of this club, where patrons and prostitutes in the employment of Austrew engaged in sexual intercourse. Some time prior to the period with which we now are concerned, Anne Sapperstein worked at the Derby Club, where her principal activities were pocket-picking and B-drinking, that is, soliciting drinks from customers.

In July of 1957, Anne Sapperstein and her husband, Harold, came to Baltimore. Shortly after their arrival in this city, they met one of the alleged victims, Dora Heathcote, to whom they offered employment as a barmaid at the Derby Club. Heathcote accepted, and the Sappersteins then obtained money for her trip to Calument City at the Baltimore office of the Western Union Telegraph Company.

pel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or

"Whoever knowingly procures or obtains any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in the District of Columbia or any Territory or Possession of the United States, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in the District of Columbia or any Territory or Possession of the United States—

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

"§ 2422. Coercion or enticement of female

"Whoever knowingly persuades, induces, entices, or coerces any woman or girl to go from one place to another in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and thereby knowingly causes such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

"§ 2423. Coercion or enticement of minor female

"Whoever knowingly persuades, induces, entices, or coerces any woman or girl who has not attained her eighteenth birthday, to go from one place to another by common carrier, in interstate commerce or within the District of Columbia or any Territory or Possession of the United States, with intent that she be induced or coerced to engage in prostitution, debauchery, or other immoral practice, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

This money was sent to the Sappersteins by Austrew, pursuant to two collect telephone conversations between them. There can be no doubt about this transaction and Austrew's part in it, for it is firmly established by the records of the telephone and telegraph companies and by Austrew's own testimony.

Part of the money sent by Austrew was used to purchase an airline ticket for Heathcote in the name of Laura Anderson. With at least a portion of the balance the Sappersteins bought the victim a set of luggage, helped her pack, and drove her to the airport; there they gave her Austrew's name and description, supplied her with the telephone number of the Derby Club, and put her on the plane. This was a National Airlines flight, which took her to Washington, D. C., where she boarded a Capital Airlines plane bound for Chicago.

On Friday, July 11, Heathcote arrived in Chicago and was met at Midway Airport by Austrew, who drove her to Calumet City and the Derby Club. During this drive and for some time after they reached the club, Austrew and the victim engaged in a conversation in which he informed her that there were no barmaid positions available, as they were all filled by men, but that she "could either dance, B-drink, or hustle." Although the defense has suggested that by "hustle" was meant "hustle drinks", the only reasonable interpretation of this remark is that Austrew was asking Heathcote to engage in prostitution. Batsell v. United States, 217 F.2d 257, at p. 262 (8th Cir.1954). By her spontaneous use of the disjunctive in relating her conversation from the witness stand, Heathcote indicated that she was confronted with not just two, but three, alternatives. This was her understanding and it must have been Austrew's intention.

At this same time Heathcote voiced displeasure with the prospects confronting her at the Derby Club, but, at Austrew's insistence, she agreed to wait until the Tuesday following her arrival before leaving. Austrew gave two reasons for requesting her to stay: first, so that he could confront the Sappersteins, upon their return from Baltimore, with her misunderstanding of the nature of her employment; and second, so that she would have a greater exposure to the activities of the club, which it was hoped would entice her to at least participate in the strip-dancing. In the following few days Heathcote observed life at the Derby Club, including B-drinking and nude dancing. But she was not altogether passive; during her brief stay in Calumet City, she herself danced upon at least two occasions, stripping to the nude each time.

In Baltimore, on Sunday, July 13, 1957, the Sappersteins met Shirley Monroe, a girl who was then but fourteen years of age. By a sequence of events similar to those which led to Heathcote's arrival in Calumet City, Monroe and a third victim, Gladys Moyers, were enticed into making the same trip, both traveling under assumed names. However, while Heathcote had been told that she was to be a barmaid, Monroe and Moyers were told that they were to be strip-dancers. Also, their flight to Chicago was diverted to Milwaukee because of poor weather conditions. Austrew, who testified that he had known the names of the two girls beforehand, eventually arrived at the Milwaukee airport, found the girls asleep there, and took them by car to Calumet City.

Once in Calumet City, Austrew took Monroe about the town. During the early morning hours, in a room over another Calumet City bar, the Four Aces Club, these two engaged in sexual intercourse. This fact, testified to by Monroe, was controverted by the defendant; furthermore, the defense contended that her testimony was contradicted also by that of a disinterested witness, Andrew Rambush. The court is of the opinion that Monroe is more credible on this point than Austrew. Also, there is nothing in Rambush's testimony that would contradict Monroe's version of the facts. Rambush testified that Austrew and Monroe arrived at his home, where she was to stay, some time after four o'clock

in the morning and that Austrew left immediately thereafter; on the other hand, the victim testified that she had had intercourse with the defendant before—and not after—reaching Rambush's house. There is no inconsistency between these two statements.

The day after her arrival in Calumet City, Monroe left and went to Chicago, only to return to the Derby Club five or six days later. Either upon her first arrival in Calumet City or upon her return from Chicago—although the former alternative appears the more likely, the precise time is unclear—Austrew told her of her duties at the club; she was to strip-dance, B-drink, and "turn tricks in the back room." The victim testified that she understood the quoted phrase to mean that she was to prostitute herself with customers at the bar, the only reasonable interpretation to which this crude expression lends itself. United States v. Marks, 274 F.2d 15, at p. 17 (7th Cir.1959). In any event, there was an agreement between Monroe and Austrew whereby she was to turn over to him or to whoever was tending the bar the proceeds of her prostitution, a portion of which was to be returned to her on a percentage basis. Pursuant to this plan, she in fact did engage in prostitution for at least two nights, turned over the proceeds to Austrew, and received from him a percentage. Also, she once again had sexual relations with the defendant.

In addition to these activities, Monroe explored every phase of the debauched world that was the Derby Club. In particular, on several occasions she performed a strip-dance of a character too vulgar to relate. Such depravity, if it needs corroboration to bring it from the realm of degenerate fantasy into the realm of plausibility, was verified by a disinterested witness, William Zachare-vich, who frequented the Derby Club during this period.

After a few days in Austrew's employment, Monroe left the Derby Club and went to work at another Calumet City night spot, the Cadillac Club. She stayed there for but one night and eventually returned to Baltimore.

## CONCLUSIONS OF LAW

Before reaching the substantive law of this case, we must consider first several objections made by the defense on which rulings were reserved until this time.

First, at the outset of the trial of this defendant, defense counsel objected to the court's taking judicial notice of Chief Judge Thomsen's earlier opinion in this case, in which the Sappersteins were found guilty.[3] United States v. Sapperstein, 198 F.Supp. 147 (D.Md.1961). This objection is wholly unmeritorious. McCormick, Evidence, § 326, at p. 695 (1954). Of course, while the court is cognizant of the law as it is expounded in that opinion, the factual determinations made there have not in any way influenced those made here.

A further objection alleges a fatal variance between the first and second counts of the indictment, both of which deal with the transportation of Monroe and Moyers, and the proof.[4] The first count charges the defendant with knowingly procuring airline tickets for the use of these girls "in interstate commerce, in going to Calumet City, Illinois, for the purpose of prostitution." On the face of it, this count allows two inferences: that the tickets were for the entire journey to Calumet City, or that they were for but a part of the journey. The latter inference is the more likely and conforms with the proof. The second count charges the defendant with knowingly persuading, inducing, enticing and coercing the victims "to go from Friend-

---

3. In making this objection, defense counsel did not refer to another opinion in this case, rendered by Judge Watkins. See United States v. Austrew, 190 F.Supp. 632 (D.Md.1961).

4. The indictment is set out in full above. See No. 1.

ship Airport, in the State of Maryland, to Milwaukee, Wisconsin, by common carrier." This charge does give the correct termini of the interstate transportation; but, in a technical and strict sense, it does not otherwise conform with the proof. If the defendant did induce Monroe and Moyers to travel, he did not induce them to travel to Milwaukee, but to Calumet City. However, slight variances such as this—if here there can be said to be a variance at all—consistently have been held not to be fatal. Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913); Bennett v. United States, 227 U.S. 333, 33 S.Ct. 288, 57 L.Ed. 531 (1913); Mellor v. United States, 160 F.2d 757 (8th Cir. 1947), cert. denied 331 U.S. 848, 67 S.Ct. 1734, 91 L.Ed. 1858 (1947). An indictment need only furnish the accused with such a description of the charge against him as will enable him to make his defense and as will protect him against double jeopardy. Under this sensible view, indictments have been upheld in which the transaction involved has been characterized broadly only as one in interstate commerce. United States v. Austrew, 190 F.Supp. 632, at p. 636 (D. Md.1961); also United States v. Hunt, 120 F.2d 592 (7th Cir.1941), cert. denied 314 U.S. 625, 62 S.Ct. 97, 86 L.Ed. 502 (1941); and Hughes v. United States, 114 F.2d 285 (6th Cir.1940). An indictment such as this should not be set aside where its specificity is greater than that which the law requires—and certainly not where the alleged variance is so very trivial.

■ Third, objection was made to the admissibility of a birth certificate, offered to prove the age of Shirley Monroe. The objection was based upon two grounds: first, that the certificate was improperly certified; and second, that there was no evidence to show that the person named in the certificate was the same as the prosecuting witness, as the certificate reverses her first and middle names. The objection is overruled. First, the document *was* properly sealed and certified. Hilliard v. United States, 121 F.2d 992, at pp. 995–996 (4th Cir. 1941), cert. denied 314 U.S. 627, 62 S.Ct. 111, 86 L.Ed. 503 (1941). Second, despite the transposition of names, the witness correctly stated every other fact contained in the certificate, and this she apparently did without having seen it. The transposition is understandable; while it weakens the document's evidentiary value, it is not believed that such a defect makes it altogether inadmissible. Even if this were not so, under an exception to the hearsay rule of great antiquity, one's own testimony as to his age is sufficient. McCormick, Evidence, § 297, at p. 621 (1954); 5 Wigmore, Evidence, § 1493 (3rd ed. 1940). The birth certificate is deemed to be admissible for whatever probative value it might possess; it carries sufficient weight to corroborate the witness' own testimony as to her age.

■ Fourth, objection was made to the admissibility of telephone and telegraph company records, submitted to establish Austrew's intimate involvement with the Sappersteins' enlistment program in Baltimore. This objection was based upon lack of relevancy and surely must be overruled. Even if the documentary evidence had not been proffered, Austrew's own testimony establishes the same fact; he admitted knowing of the Sappersteins' recruitments and sending them the money with which the victims were to travel from Baltimore to Calumet City. Also, Austrew admitted that he knew the names of these victims prior to meeting them at the two airports.

■ The fifth and final objection relates to the admissibility of conversations between the co-defendants Sappersteins and the two victim-witnesses, Heathcote and Monroe. All of these conversations took place outside the presence of the defendant and were presented to show cooperation between Austrew and the Baltimore procurers, the intentions of Austrew, and the purpose of the transportation. When, as here, several persons are jointly indicted for the commission of a crime and it is

proved that they acted in concert to accomplish their end, evidence of the declarations and acts of each, in the furtherance of their criminal design, is admissible against all; and, this is true even though conspiracy is not formally charged in the indictment. Carpenter v. United States, 264 F.2d 565, at p. 572 (4th Cir.1959), cert. denied 360 U.S. 936, 79 S.Ct. 1459, 3 L.Ed.2d 1548 (1959); Hilliard v. United States, supra, 121 F.2d at p. 999 (dicta); Sprinkle v. United States, 141 F. 811 (4th Cir.1905). Austrew's own admissions and the corroborative records of the telephone and telegraph companies have provided that quantum of proof necessary to establish the fact that he and the Sappersteins acted in concert; therefore, the principle just stated is clearly applicable. However, under this same principle, all testimony concerning statements and actions of the Sappersteins *subsequent* to the transportation must be stricken. Hilliard v. United States, supra. As the statements of the Sappersteins *prior* to the transportation are deemed admissible only to show a state of mind, the exclusionary hearsay rule is quite irrelevant. McCormick, Evidence, § 228, at pp. 465–467 (1954); 6 Wigmore, Evidence, §§ 1766, 1770, 1772, and 1789 (3rd ed. 1940). It might be added that, even if all of the testimony to which this objection has been made were excluded *in toto,* the remaining evidence nonetheless is sufficient to sustain the facts and conclusions contained in this opinion.

Now, having disposed of these objections, we may reach the substantive law of this case.

■ First, the interstate transportation is here well established in fact; this point need not be belabored, as it is admitted by the defense. And, it is well established in law that one need only to have provided the necessary money for the transportation to be deemed to have procured the tickets and the transportation oneself. Furthermore, the act of furnishing this money, which is used for the trip in accordance with the plan of the one supplying it, is sufficient to establish the element of inducement. Williams v. United States, 271 F.2d 703, at pp. 706–707 (4th Cir. 1959), citing Ege v. United States, 242 F.2d 879 (9th Cir.1957). So, Austrew directly and principally—not merely by imputation—procured the tickets and induced the victims to go to Calumet City, regardless of the involvement of the Sappersteins and regardless of the applicability of the aiding and abetting section. That he did not send the money to these girls directly, but used the aiding and abetting Sappersteins as a conduit, does not militate against this conclusion. Williams v. United States, supra. He clearly knew those for whom the money was intended, but even this knowledge is not essential to sustain the application of this principle. Pine v. United States, 135 F.2d 353 (5th Cir.1943), cert. denied 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 439 (1943).

■ Under the Mann Act, the offense is complete when it is shown, as has been done here, that the defendant knowingly induced the interstate transportation and that the victim crossed a state boundary. However, this is true only where it is shown also that the defendant had the requisite intent and purpose that the victim "give herself up to the practice of prostitution, or * * * give herself up to debauchery, or any other immoral practice." 18 U. S.C.A. § 2421; Harms v. United States, 272 F.2d 478 (4th Cir.1959), cert. denied 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960). While the intention must exist prior to or concurrently with the transportation, it may be inferred from the character of the environment and the subsequent conduct of the parties. Athanasaw v. United States, 227 U.S. 326, 33 S.Ct. 285, 57 L.Ed. 528 (1913); United States v. Boyette, No. 8248, 299 F.2d 92 (4th Cir., January 6, 1962); Van Pelt v. United States, 240 F. 346 (4th Cir.1917); United States v. Marks, supra; Pine v. United States, supra. The wisdom of this rule is obvious; for, were the contrary true, all evidence re-

lating to matters after the crossing of the state line and relating to the character of the destination would be excluded, with the undesirable result that an existing intent seldom would be established. Subjective facts are difficult to prove, because it is the rare case in which the party whose state of mind is the subject of inquiry has spoken. Typically, then, triers of fact must make reasonable inferences from the conduct of the party in question and the surrounding circumstances.

From the facts in this case it is abundantly clear that Austrew, at all times, intended that these girls live a life of prostitution and debauchery. The degenerate character of the Derby Club, with its B-drinkers, pick pockets, stripdancers, and one-bed brothel in the rear room; the use of assumed names; Austrew's substantial financial investment in these girls, somewhat in excess of $300.00; their inexperience with respect to the more innocuous activities for which Austrew claimed he wanted them; his telling Heathcote that she was to "hustle" and Monroe that she was to "turn tricks in the back room"; Heathcote's dancing in the nude; Austrew's engaging in sexual intercourse with Monroe upon her first night in Calumet City and after her return from Chicago; his successful attempt to induce her to prostitute herself; his financial arrangement with her, which was consummated; and Monroe's disgusting dance, performed more than once and with Austrew's apparent knowledge and approbation: all this establishes, beyond a reasonable doubt, Austrew's criminal intent. His dominant motive was that these girls engage in activities proscribed by the statute.[5] Any other conclusion would be frivolous and unmindful of the weight of the evidence.

With respect to the second count of the indictment, it is sufficient that only one of the two victims named therein be proved to have been under the statutory age of eighteen. Bennett v. United States, supra.

With respect to the third and fourth counts, the government was not required to prove that Heathcote actually engaged in prostitution. It is not an essential element of the offense that the defendant succeed in achieving his iniquitous end. United States v. Marks, supra. Indeed, it is enough to prove that the environment into which the victim is brought " 'would necessarily and naturally lead to a life of debauchery of a carnal nature relating to sexual intercourse between man and woman.' " Athanasaw v. United States, supra, 227 U.S. 326, at p. 333, 33 S.Ct. 285, at p. 287. This has been proven here.

For the aforegoing reasons, the defendant, William Michael Austrew, also known as Bill Davis, must be found guilty on all four counts.

---

5. See the discussion of Mortensen v. United States, 322 U.S. 369, 64 S.Ct. 1037, 88 L.Ed. 1331 (1944), by Thomsen, Chief Judge, in United States v. Sapperstein, 198 F.Supp. 147 (D.Md.1961).