Glen Watson REAMER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17163.

United States Court of Appeals Eighth Circuit.

June 7, 1963.

---

T. Eugene Thompson, St. Paul, Minn., made argument for the appellant and filed brief.

Murray L. Galinson, Asst. U. S. Atty., Minneapolis, Minn., made argument for the appellee; Miles W. Lord, U. S. Atty., Minneapolis, Minn., was with him on the brief.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and YOUNG, District Judge.

BLACKMUN, Circuit Judge.

Glen Watson Reamer in March 1962 was charged by indictment [1] with a violation of the Mann or White-Slave Traffic Act, 18 U.S.C.A. § 2421.[2] He pleaded not guilty and, in the manner prescribed by Rule 23(a), F.R.Cr.P., waived his right to a jury trial. He was convicted by the court and received a sentence of three years with the provision, "Defendant to be confined in a Jail type institution for a period of four (4) months. The execution of the remainder of the sentence of imprisonment is hereby suspended and the defendant placed on probation for such period as remains".

Reamer now appeals in forma pauperis. The complete transcript of the trial was provided at government expense.

The defense argues insufficiency of the evidence and error in denying its motion for judgment of acquittal.

The events in question took place on the cold Minnesota-Wisconsin winter night of January 20–21, 1962. There was snow on the ground. Reamer, then 28, first met Sally about 8:45 P.M. that evening at Scotty's Tavern in St. Paul. This was a combination "neighborhood" 3.2 beer parlor and grocery store. Sally was 18 and unmarried. She had a tenth grade education. She had never had a date alone with a man before. Her parents were at the tavern that evening. Sally telephoned her mother there and was asked to come over to get the bread and milk her mother had purchased. She came. The defendant introduced himself to Sally as "Jack Larson". She was invited to sit at his table. She did so. She had a soft drink. Reamer asked Sally's father if he might take her to a movie. Her father consented if he would bring her home by one o'clock. The two left the tavern about nine. Reamer did not take her to a movie but stopped instead at his brother's home nearby. There Reamer had whiskey. Some was offered to Sally but she refused it and said she did not drink. After about 20 minutes Reamer and Sally left and went to a restaurant in downtown St. Paul. While there Reamer told Sally he was going to take her to Hudson, Wisconsin, because 18-year old girls could drink legally in that state.[3] Sally told him she did not wish to go to Hudson and that

---

1. "That on or about January 20, 1962 in the City of St. Paul, State and District of Minnesota, Third Division, the Defendant

   GLEN WATSON REAMER

   did knowingly transport in interstate commerce, to-wit: from St. Paul, Minnesota, to Hudson, Wisconsin, and vicinity, a woman for the purpose of debauchery and other immoral purposes and with the intent and purpose to induce, entice and compel such woman to give herself up to debauchery and to engage in immoral practices; in violation of Title 18 United States Code, Section 2421."

2. § 2421.

   "Whoever knowingly transports in interstate * * * commerce, * * * any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; * * *

   "Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

3. This is not legal in Minnesota. M.S.A. §§ 340.731, 340.732, 340.79, 340.80, 645.-45(14).

she did not drink. However, when Reamer agreed to stay in Hudson for only 15 minutes, she consented to go. Sally had never been in Hudson before.

Hudson is a Wisconsin town approximately 16 miles east of St. Paul. It is on the east side of the St. Croix River which, at that point and north beyond Stillwater, Minnesota, 10 miles upstream, constitutes the boundary between Minnesota and Wisconsin. There are paved roads on each side of the river between Hudson and Stillwater and there are bridges at each of these points.

The defendant drove Sally to Hudson. They spent approximately two hours there at the Badger Bar and at Sam's Bar. Sally had cokes at both places. The defendant had whiskey and some food. They left Sam's about 12:30 A.M. with Reamer agreeing to take Sally home. Up to this point, as Sally testified, Reamer had not "done anything that [she] objected to".

The foregoing facts are not in dispute. What happened between the time the couple left Sam's Bar and Reamer's return of Sally to her St. Paul home about four hours later with her feet swollen from frostbite is said by the defense to be in dispute. Sally was the only direct witness as to this period for the defendant did not take the stand.

Sally testified on direct examination that after they left Sam's Bar, Jack Larson did not take her back to St. Paul but that, instead, he stopped his car on the road and attacked her. We need not at this point set forth all the described details. In themselves they are not too important. It is enough to note that Sally testified that the defendant's advances to her were with force; that he removed much of her clothing; that she resisted; that intercourse was effected; that she was able to get out of the car; that she ran down the road; that she lost her shoes; that she encountered barbed wire; that she cut her legs; that the defendant ran after her and caught up with her; that he said once more he would bring her home; that she walked back to the car with him; that her feet were frozen;

that when they returned to the car he again had intercourse with her; that they then drove to the Green Acres Motel; that she took a shower there and he assisted in thawing out her feet; that they returned to St. Paul about five A. M.; that the defendant carried her to the porch of her home because she could not walk; that he left her on the porch; that the police were called; and that she went to the hospital for ten days.

On cross-examination Sally testified that she had never had anything to drink; that she was introduced to the defendant's brother and his wife at their house but could not remember whether they were referred to as Mr. and Mrs. Reamer; that she did consent to go to Wisconsin; that she had only coke at the Badger Bar; that at Sam's Bar she refused the defendant's offer of a drink and had coffee instead; that it was about an hour after they left Sam's place when the defendant stopped the car; that this was "out in the country"; that the defendant had kissed her that evening when they left his brother's home, when they entered the Badger Bar, and when they left Sam's place; that she did not cooperate with him in any way in his advances; that when she got out of the car she did so on the driver's side and fell into a ditch and met with barbed wire and was cut; that she then ran up the hill with the defendant after her; that he did not disturb her at the motel while she took her shower; that when she came out of the bathroom with only a slip on she lay on the bed; that Reamer was then in the bed; that he fondled her; that she objected to this and told him to take her home; that he obtained her underclothing from the car; that he took her home; that she was completely dressed, except for her shoes when she arrived home; that she had been at Stillwater before; that the road on which the incident took place was between Stillwater and Hudson; that she knew there were two roads between these towns; that she had no idea where the car was stopped other than that it was a plain road and no houses were nearby; that

she did not know for sure if it was in Wisconsin; that she was not familiar with the area between Hudson and Stillwater; that the place they stopped could have been in Minnesota; and that the Green Acres Motel was in Wisconsin.

Sally's father testified that he met the defendant at Scotty's Tavern on the night of January 20; that the defendant introduced himself as Jack Larson; that he had seen him three or four times before but had not talked with him; that the defendant asked him if he could take Sally to a show; and that he told the defendant she had never been with men.

Her mother testified that they had met the defendant once or twice before to the extent of greeting him.

The prosecution stipulated that Reamer sustained no orgasm on the night in question. There is other testimony, not contested, that the Green Acres Motel is in Wisconsin across the St. Croix River east from Stillwater, and that Reamer registered there that night as "Mr. and Mrs. Glen W. Reamer".

There are some discrepancies in Sally's testimony; it is also evident that she was not positive about the exact location of the car when it was stopped, or, perhaps, even about the ultimate nature of the physical advances Reamer made upon her. It is apparent, too, that Sally was not well educated or experienced and that she was emotionally upset upon the happening of the events that evening. Her judgment and that of her parents may not have been good but the points of discrepancy and of unsureness in her testimony, as we point out below, concern matters of little legal consequence in the light of other admitted or established facts.

On this record there is no dispute that Reamer used a false name in his introduction to Sally and her parents; that he asked her to go with him to Hudson; that he drove her from Minnesota to Wisconsin; that he was drinking both before and after that drive; that he stopped the car at a lonely spot; that he effected sex play of some kind with Sally;

that Sally endeavored to get away; that she was able to get out of the car; that she encountered barbed wire and sustained lacerations and severely frostbitten feet; that the defendant registered himself and Sally as husband and wife in a Wisconsin motel; and that he drove her back to her home in Minnesota in the very late hours of the night.

The defense here is three-fold. It is first argued that the Mann Act does not embrace activity of the essentially private and non-commercial kind indulged in by Reamer with Sally. It is urged next that, even if the statute is sufficiently broad to encompass this, the prosecution's case falls short of establishing that any act proscribed by the statute took place outside Minnesota, or in other words, that the interstate aspect was not proved. It is argued, last, that, even if the statute is broad, the prosecution's proof also falls short of establishing that the interstate transportation was effected with the requisite intent on the part of the defendant, that is, with a then existing, and not later acquired, purpose of the kind described in the statute.

A. The application of the Mann Act. There is of course, nothing in the indictment's charge and nothing whatsoever in this record which associates the events of the night with either commercialized vice or pecuniary gain to Reamer or habitual conduct on his part with Sally. The government does not so contend. This was a private "date" and concerned only personal intimacies between the two.

The defense argument as to the scope and breadth of the Act is concededly not new. The Supreme Court has passed upon it on more than one occasion. Although the cases decided by that Court dealt with what is perhaps to be described as the more serious situations of intended concubinage and polygamous relationships, and although there were vigorous dissents, the Court's attitude and holdings as to the application of the statute are clear.

"It is contended that the act of Congress is intended to reach only

'commercialized vice' * * *. In none of the cases was it charged or proved that the transportation was for gain or for the purpose of furnishing women for prostitution for hire, and it is insisted that, such being the case, the acts charged and proved, upon which conviction was had, do not come within the statute. * * * There is no ambiguity in the terms of this act. It is specifically made an offense to knowingly transport or cause to be transported, etc., in interstate commerce, any woman or girl for the purpose of prostitution or debauchery, or for 'any other immoral purpose,' or with the intent and purpose to induce any such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice. * * *

"While such immoral purpose would be more culpable in morals and attributed to baser motives if accompanied with the expectation of pecuniary gain, such considerations do not prevent the lesser offense against morals of furnishing transportation in order that a woman may be debauched, or become a mistress or a concubine from being the execution of purposes within the meaning of this law. To say the contrary would shock the common understanding of what constitutes an immoral purpose when those terms are applied, as here, to sexual relations." Caminetti v. United States, 1917, 242 U.S. 470, 484–486, 37 S.Ct. 192, 194, 61 L.Ed. 442.

"It is argued that the Caminetti decision gave too wide a sweep to the Act; that the Act was designed to cover only the white slave business and related vices; that it was not designed to cover voluntary actions bereft of sex commercialism * * *. In support of that interpretation an exhaustive legislative history is submitted * * *. Prostitution, to be sure, normally suggests sexual relations for hire. But debauchery has no such implied limitation. In common understanding the indulgence which that term suggests may be motivated solely by lust. * * * We do not stop to reexamine the Caminetti case to determine whether the Act was properly applied to the facts there presented. But we adhere to its holding, which has been in force for almost thirty years, that the Act, while primarily aimed at the use of interstate commerce for the purposes of commercialized sex, is not restricted to that end." (footnotes omitted) Cleveland v. United States, 1946, 329 U.S. 14, 17–18, 67 S.Ct. 13, 14–15, 91 L.Ed. 12.

And in Mortensen v. United States, 1944, 322 U.S. 369, p. 375, 64 S.Ct. 1037, p. 1040, 88 L.Ed. 1331, where a conviction was reversed by a bare majority, that majority nevertheless said:

"What Congress has outlawed by the Mann Act, however, is the use of interstate commerce as a calculated means for effectuating sexual immorality."

See also Hawkins v. United States, 1958, 358 U.S. 74, 79–80, footnote 9, 79 S.Ct. 136, 3 L.Ed.2d 125, and United States v. Bitty, 1908, 208 U.S. 393, 402, 28 S.Ct. 396, 52 L.Ed. 543.

On these holdings alone, and not being presumptuous enough to assume that the scope of the statute today has shrunk in the seventeen years since the Cleveland case was decided, we would feel compelled here to rule against the defense on this issue and to hold that the statute does have valid application to a situation such as that described in the present record.

The law in this circuit furthermore is settled. This court, in following what it felt was the lead of the Caminetti case, has viewed the statute broadly and has held it applicable to a private, non-commercial, casual and non-habitual venture of the kind we have here. In Brown v. United States, 8 Cir., 1956, 237 F.2d 281, a case strikingly similar to this one, so

far as its pertinent facts are concerned, Judge Sanborn said, p. 283:

"The language of Section 2421, Title 18 U.S.C. in our opinion, covers the interstate transportation, without pecuniary motive, of a woman with intent to have illicit relations with her by force or otherwise."

Earlier opinions of this court are to the same effect. Blackstock v. United States, 8 Cir., 1919, 261 F. 150, cert. denied 254 U.S. 634, 41 S.Ct. 8, 65 L.Ed. 449; Carey v. United States, 8 Cir., 1920, 265 F. 515; Christian v. United States, 8 Cir., 1928, 28 F.2d 114; Poindexter v. United States, 8 Cir., 1943, 139 F.2d 158.

Every other federal court of appeals has recognized the application of the statute to non-commercial as well as to commercial activity.[4]

■ The defense recognizes the existence of these cases and their established authority. It presses upon us, however, the case of United States v. McClung, E. D.La., 1960, 187 F.Supp. 254, and urges that we reexamine the purposes of the White-Slave Traffic Act. It is true that Judge J. Skelly Wright (now of the Court of Appeals for the District of Columbia) in that case held that the Act did not apply to conduct charged in the indictment there, namely, transportation in interstate commerce of each of two named women "for an immoral purpose, to-wit, for the purpose of engaging in sexual intercourse and other sexual acts with her". The court emphasized the legislative history of the Act and said that "the only type of immorality intended is that which is habitual". Whether McClung is to be distinguished on its facts (its indictment's lack of reference

to debauchery; absence of victimization) from the present case, whether the opinion tends to support the defense position here, and whether it contains valid elements of protest against Caminetti and Cleveland and the extension of principles enunciated in those cases, are matters which we need not determine. We are satisfied that Caminetti and Cleveland and the unbroken line of consistent appellate authority leave us no present room for contrary statutory construction irrespective of what this panel's reactions to this case might be were it one of first impression. We are controlled by the decided cases. If the law in this area is to be changed by judicial decision at this late date, that step is one to be taken by the Supreme Court and not by this inferior federal appellate court.

As a last detail on this point, we are not to be persuaded by references to the legislative history of the Act. This perhaps would be of greater moment had that history not been unearthed before. It is clear, however, that it was presented to the Supreme Court in Caminetti, see pp. 474–475, 481, 490, and 497–499 of 242 U.S., pp. 193, 196, and 199–200 of 37 S. Ct., in Cleveland, pp. 17 and 27–28 of 329 U.S., pp. 14 and 19–20 of 67 S.Ct. and in United States v. Beach, 1945, 324 U.S. 193, 65 S.Ct. 602, 89 L.Ed. 865, where the dissent makes much of it. This was noted by the Third Circuit in United States v. Reginelli, supra, p. 597 of 133 F.2d.

■ We hold that the Act is of sufficient breadth to apply to an enterprise of the kind which took place here. This first point, therefore, must be decided adversely to the defense.

4. Jarabo v. United States, 1 Cir., 1946, 158 F.2d 509, 511; United States v. Pape, 2 Cir., 1944, 144 F.2d 778, 781, cert. denied 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602; United States v. Reginelli, 3 Cir., 1943, 133 F.2d 595, 597, cert. denied 318 U.S. 783, 63 S.Ct. 856, 87 L.Ed. 1150; Sipe v. United States, 1945, 80 U. S.App.D.C. 194, 150 F.2d 984, cert. denied 326 U.S. 788, 66 S.Ct. 473, 90 L.Ed. 478; Simon v. United States, 4 Cir., 1944,

145 F.2d 345, 347; Masse v. United States, 5 Cir., 1954, 210 F.2d 418, cert. denied 347 U.S. 962, 74 S.Ct. 711, 98 L. Ed. 1105; Whitt v. United States, 6 Cir., 1959, 261 F.2d 907, 909; United States v. Marks, 7 Cir., 1959, 274 F.2d 15, 18; Ghadiali v. United States, 9 Cir., 1927, 17 F.2d 236, 237, cert. denied 274 U.S. 747, 47 S.Ct. 660, 71 L.Ed. 1328; Long v. United States, 10 Cir., 1947, 160 F.2d 706.

B. The interstate feature. As we have already noted, the defense concedes that Reamer knowingly transported Sally from Minnesota to Wisconsin. Yet Sally's testimony as to where, whether in Minnesota or in Wisconsin, Reamer's advances to her took place is confused and uncertain. The car was stopped presumably in Wisconsin if Reamer took from Hudson the road east of the St. Croix; it was stopped presumably in Minnesota if he took the road on the west side of the river. And Sally's testimony is not entirely consistent as to whether intercourse was effected.

We think that, so far as the interstate feature is concerned, consummation of intercourse and its Minnesota or Wisconsin situs are of no ultimate legal significance here. What is significant is the knowing transportation of the girl from St. Paul in Minnesota to Hudson in Wisconsin. If the necessary intent is present and there is knowing interstate transportation, it is immaterial whether the immoral act took place or whether there was consummation. Actual fulfillment of the purpose is not necessary. Wilson v. United States, 1914, 232 U.S. 563, 570–571, 34 S.Ct. 347, 58 L.Ed. 728; Cleveland v. United States, supra, p. 20 of 329 U.S. p. 16 of 67 S.Ct.; Batsell v. United States, 8 Cir., 1954, 217 F. 2d 257, 261–262; Bell v. United States, 8 Cir., 1958, 251 F.2d 490, 491; United States v. Marks, 7 Cir., 1959, 274 F.2d 15, 18–19. And the fact that the travelers, having crossed a state line, could have returned to the state of origin does not deny the interstate aspect. Batsell v. United States, supra, p. 261 of 217 F. 2d.

The interstate feature, so far as it is necessary under the statute, was therefore established in this case.

C. The defendant's intent. The statute requires that the transportation be for a purpose specified. Under this indictment, it must be that of debauchery "or any other immoral practice". This purpose "must be found to exist before the conclusion of the inter-

state journey and must be the dominant motive of such interstate movement". Mortensen v. United States, supra, p. 374 of 322 U.S. p. 1040 of 64 S.Ct.; Hansen v. Haff, 1934, 291 U.S. 559, 563, 54 S.Ct. 494, 78 L.Ed. 968. It must be an "efficient purpose", albeit one of several, as distinguished from an incidental one. Mellor v. United States, 8 Cir., 1947, 160 F.2d 757, 764, cert. denied 331 U.S. 848, 67 S.Ct. 1734, 91 L.Ed. 1858; Daigle v. United States, 1 Cir., 1950, 181 F.2d 311, 314; Dunn v. United States, 10 Cir., 1951, 190 F.2d 496, 497–498. But Mann Act intent may be inferred from all the circumstances. Shama v. United States, 8 Cir., 1938, 94 F.2d 1, 4, cert. denied 304 U.S. 568, 58 S.Ct. 1037, 82 L.Ed. 1533; Berry v. United States, 8 Cir., 1960, 283 F.2d 465, 466, cert. denied 364 U.S. 934, 81 S.Ct. 380, 5 L.Ed.2d 366.

Although this case could be said to be somewhat close, we have no difficulty in concluding that the evidence here is sufficient to support the court's necessary finding of the requisite intent in Reamer when he drove Sally from St. Paul to Hudson. His use of a false name, not only to Sally, but to her parents; his repeated talk of a movie, coupled with his continuing delay in ever getting started toward one; his awareness from the very beginning that Sally did not drink, had never had an alcoholic beverage, and did not wish to drink; and his being told by her father that she had never dated with a man alone before, support an inference of immoral purpose with respect to Sally even before the couple left St. Paul. His knowledge of her negative drinking habits transforms into a hollow excuse his claim that the purpose of his drive to Wisconsin was to enable her to drink legally in public. The fact that two hours elapsed between their arrival at Hudson and their departure does not compel an adverse finding as to intent; the acquisition of the requisite courage, bolstered by continuing liquor consumption, may have required that much time. The Court's determination of guilt, entailing, as it must, a finding that Sally's transportation was for an immoral pur-

pose within the meaning of the Act, has adequate foundation in the evidence.

Mr. T. Eugene Thompson of the St. Paul bar was appointed by the district court as counsel for the defendant for both the trial and this appeal. Mr. Thompson has given the defendant vigorous representation and he came to St. Louis at his own expense to present the oral argument. This has prompted us to set forth the facts and law in greater detail than we would ordinarily do in a case of this kind. We are grateful to Mr. Thompson for his assistance.

Affirmed.